Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/12/2019 09:06 AM CDT

Marissa Renee Blank, appellant, v.
Caleb Robert Blank, appellee.
___ N.W.2d ___

Filed July 12, 2019.    No. S-18-751.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Evidence: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Due Process.** Due process principles protect individuals from arbitrary deprivation of life, liberty, or property without due process of law.

5. **Due Process: Notice.** Due process does not guarantee an individual any particular form of state procedure; instead, the requirements of due process are satisfied if a person has reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights which might be affected by it.

6. **Constitutional Law: Due Process.** The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.

7. **Child Custody.** The factual inquiry for awarding joint custody is substantially different from that for an award of sole custody.

8. ____. When a trial court determines at a general custody hearing that joint physical custody is, or may be, in a child's best interests, but neither party requested joint custody, the court must give the parties an opportunity to present evidence on the issue before imposing joint custody.

9. ____. Joint physical custody must be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars.

10. ____. A trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests.

11. ____. The best interests of the child are the primary consideration for developing custodial plans.

12. ____. In considering a child's best interests in the development of custodial plans, it is a common occurrence and a court is permitted to supply a party with final decisionmaking authority in some areas to avoid future impasses which could negatively affect the child while maintaining both parents' rights to consultation and participation in important decisions.

Appeal from the District Court for Phelps County: Terri S. Harder, Judge. Affirmed.

Jeffrey P. Ensz, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellant.

John D. Icenogle, of Bruner Frank, L.L.C., for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

Marissa Renee Blank appeals the district court's decree of dissolution dissolving her marriage to Caleb Robert Blank and awarding joint legal and physical custody of the parties' two minor children. On appeal, Marissa claims the court erred in awarding joint custody without advance notice when neither

party made such request. Marissa also claims the court erred in determining that the case did not involve domestic abuse and in not making the statutorily required additional findings. Finally, Marissa claims the court abused its discretion in determining joint custody was in the children's best interests. For the reasons set forth herein, we affirm.

## BACKGROUND

Marissa and Caleb were married on May 19, 2011. The parties have two minor children: a daughter, who was born in 2011, and a son, who was born in 2014.

Marissa filed a complaint for dissolution of marriage in February 2017. In the complaint, Marissa stated, "I am and my spouse is able to provide support for the child(ren)" and asked that the court "[a]ward [j]oint legal custody of the children of this marriage." Caleb signed a voluntary appearance acknowledging receipt of a copy of the complaint.

At the same time the complaint was filed, Marissa offered a proposed parent-created parenting plan which was signed by both parties. This proposed plan outlined that Marissa would have legal custody in that she "shall have the legal responsibility and authority to make final decisions concerning the parenting functions necessary to raising the child(ren)." The proposed plan additionally listed Marissa's residence as the principal place of residence subject to the terms of the plan. As to parenting time and holidays, the proposed plan detailed that the parties' work schedules would dictate the parenting times and indicated that the parties would be able to work together to minimize either party's paying for daycare. No order adopting this plan was entered by the district court.

Caleb filed another proposed parenting plan signed by both parties on May 11, 2017. This proposed plan established that the "parties shall share joint legal and physical custody of the minor children and as such, shall maintain the legal responsibility and authority to make final decisions concerning the parenting functions necessary for raising the minor children."

The proposed plan explained that the children's principal residences would be with both Marissa and Caleb and outlined a parenting time schedule for Caleb. This plan also contained references to the parties' ability to coordinate adjustments to the schedule and discuss parenting decisions with each other. Again, no order adopting the plan was entered by the district court.

On May 23, 2017, Caleb filed a motion for temporary orders seeking "joint temporary legal and physical care, custody[,] and control" of the children. Following a hearing on the motion, the court entered a "Temporary Order/Parenting Plan." That order awarded temporary legal and physical custody to Marissa and declared that each parent have full and equal access to the children's education and medical records and the authority to make emergency decisions affecting the health or safety of the children. The order further provided a parenting plan with continuous and easy telephone access and midweek, every-other-weekend, and alternating-holiday parenting time.

A trial was held on the complaint in June 2018 on the remaining issues to be decided, including "custody of the parties' two minor children, parenting time, and financial issues concerning the children."

Marissa testified as to the care of the children. She opined that throughout the children's lives, she was the primary caretaker. She explained that she took 2 months off work to stay home after their daughter was born, that she worked only part time after returning to the work force, and that she would split her work shifts in order to go home to breastfeed because their daughter "wouldn't take a bottle." Marissa further explained that she was primarily the one to take the children to events and activities. Marissa testified that Caleb would take care of the children when she was working and he was off but that when both parents where available to care for the children, the responsibilities fell solely on her. Marissa also testified that following the temporary order, the children were performing

well, and that the schedule is very structured for their benefit. Marissa testified about the parties' working relationship and agreed they have made accommodations for each other with regard to the children's care. Marissa further testified that following the temporary order, the parties were able to communicate and work together civilly. Marissa testified that both she and Caleb have new relationships and, with those parties, new houses in which the children stay.

Marissa asserted that she was the primary parent to take the children to the doctor when they were sick and that the parties agreed not to vaccinate the children. However, Marissa did admit Caleb was the one who took the children to the doctor for chicken pox and lice following the temporary order.

Caleb testified that the parties shared the childcare responsibilities equally when both parents were home. However, Caleb explained that because he works more, Marissa would watch the children more when he was not home. Caleb explained that when Marissa was working, he would make supper, prepare baths, and put the children to bed. Caleb also testified that while he initially agreed not to vaccinate the children, he would now seek to have them vaccinated if given legal custody.

Caleb admitted that he had punched a couple of holes in a basement wall within 2 or 3 years prior to trial while the children were upstairs in the home. Caleb explained, "An argument, I honestly do not recall what it was about, escalated; and I just — I got really angry. So I walked away. I went into the basement of the marital home, and I punched the wall." Caleb also admitted that he had "open hand smacked" Marissa at one point due to a disagreement which occurred "so far in the past." Marissa agreed on rebuttal to her attorney's questioning that Caleb "slapped you at some point in the relationship." However, Caleb also testified that while Marissa was watching their son, she kicked a hole in a door out of frustration, and testimony was received that Marissa is more physical with the children than Caleb.

Marissa requested that the court grant her sole custody and testified that she did not believe a shared custody arrangement was in the children's best interests. Specifically, Marissa responded as follows to questioning on direct examination:

Q [by Marissa's counsel:] There was some talk — well, maybe not. Rather do you believe that a shared custody arrangement where you split time would be in the children's best interest?

A [by Marissa:] No.

Q Why do you feel that way?

A I feel that way because Caleb rushed into a new relationship, not only a new relationship but a new relationship where she had kids as well. And I don't feel that his relationship with the kids was a strong enough bond for them not to worry if he's still going to love them.

. . . .

Q Do you believe there's any question as to who the primary caretaker was during your marriage between you and Caleb?

. . . .

A No.

Q Who was the primary caretaker?

A It was me.

Q Do you believe — is that part of your reason why you believe that a shared custody arrangement would not be appropriate?

A Yes.

In response to questioning on cross-examination about her concerns "about joint custody" because Caleb had "rushed into a . . . relationship," Marissa agreed that she began her new relationship and moved in with her significant other before Caleb's new relationship. Counsel for Marissa argued during closing argument that this case is not appropriate for joint custody or a shared custody arrangement, "as clearly there's enough conflict in here that that could create a problem

for the children" and cause a "significant upheaval" of the children's current structure, which was working.

Caleb, in turn, requested that the court award him full custody. Alternatively, Caleb asked for an award of joint custody, responding as follows on direct examination:

Q [by Caleb's counsel:] And if the Court doesn't grant you sole legal and physical custody, are you asking the Court to award you joint?

A Yes.

Q Are you willing to coparent with [Marissa]?

A Yes.

Q And how would you go about doing that?

A Communication, open mindedness. I understand and respect that she is their mother, and they will always love her as they will always love me. And I will do my best to foster a positive relationship with their mother as I feel is needed for them.

. . . .

Q . . . Do you believe that joint custody is a viable option?

A It could be.

Q Are you willing to work for it?

A Yes.

. . . .

Q Do you believe that it's in the children's best interest that joint legal custody be granted?

A Yes.

Counsel for Caleb also addressed joint custody during closing arguments, asserting, "[I]t's [not] good public policy to throw out joint custody simply because [Marissa] doesn't want to put in any effort to do it" and "We've heard a lot of testimony from [Caleb] who says he's been more than willing to attempt to coparent as a joint family."

Following trial, the court entered a decree dissolving the marriage and awarding the parties joint legal and physical custody of the children. Additionally, the decree ordered that, in

the event of impasses after discussion of major issues, Caleb "shall make the decision with respect to issues of health and religion" and Marissa "shall make the decision on education." The court specifically found this was not a domestic abuse case as defined in Nebraska's Parenting Act, that the parties have the ability to coparent and make contributions to the children, and that joint custody is in the children's best interests. The court again declared that each parent have full and equal access to the children's education and medical records and the authority to make emergency decisions affecting the health or safety of the children. In an attached parenting plan, the court instructed that the parties share parenting time on a week-on-week-off basis with assigned midweek and holiday parenting times for the parent who does not have the children at that time.

## ASSIGNMENTS OF ERROR

Marissa assigns, restated, that the district court erred in (1) awarding joint physical custody without advanced notice when neither party made such request, (2) not finding this to be a domestic abuse case and failing to make the statutorily required additional findings in awarding joint physical custody, and (3) abusing its discretion in determining joint physical custody was in the children's best interests.

## STANDARD OF REVIEW

[1-3] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.[1] A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted

---

[1] *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017).

for disposition.[2] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[3]

## ANALYSIS

### NOTICE OF JOINT CUSTODY CONSIDERATION

Neb. Rev. Stat. § 42-364(1)(b) (Reissue 2016) requires a court to determine physical custody based upon the best interests of a child and such determination shall be made by incorporating (i) a parenting plan developed by the parties, if approved by the court, or (ii) a parenting plan developed by the court based upon evidence produced after a hearing in open court if no parenting plan is developed by the parties and approved by the court. Section 42-364(3) allows for a joint physical custody award if (a) both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

Marissa contends that the district court erred in awarding joint physical custody because neither party made such a request prior to trial and the court did not provide notice of its consideration. In arguing the parties lacked notice and an opportunity to be heard on the issue of joint physical custody, Marissa cites *Hill v. Hill*,[4] a Nebraska Court of Appeals case utilizing our opinion in *Zahl v. Zahl*.[5]

---

[2] *Whitesides v. Whitesides*, 290 Neb. 116, 858 N.W.2d 858 (2015).

[3] *Erin W., supra* note 1.

[4] *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013).

[5] *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007).

[4-6] Both *Zahl* and *Hill* evaluated the notice requirement under a due process analysis. Due process principles protect individuals from arbitrary deprivation of life, liberty, or property without due process of law.[6] Due process does not guarantee an individual any particular form of state procedure; instead, the requirements of due process are satisfied if a person has reasonable notice and an opportunity to be heard appropriate to the nature of the proceeding and the character of the rights which might be affected by it.[7] The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law.[8]

[7,8] The parties in *Zahl* both sought sole custody of their child. However, after a general custody hearing in which the parties only presented evidence on why he or she would be the best sole custodian, the trial court awarded joint legal and physical custody.[9] No reference to joint custody was made during or prior to the hearing absent the mother's testimony at the end of the hearing that she would be willing to cooperate if joint custody was imposed.[10] In reversing the trial court's decision, we explained that the factual inquiry for awarding joint custody is substantially different from that for an award of sole custody.[11] As such and because neither party requested it, the parties were not put on notice that joint custody was in issue and the parties were entitled to a new hearing with such notice.[12] We held that when a trial court determines at a general custody hearing that joint physical custody is, or may be, in a

---

[6] *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

[7] *Id.*

[8] *Id.*

[9] *Zahl, supra* note 5.

[10] *Id.*

[11] See *id*.

[12] *Id.*

child's best interests, but neither party requested joint custody, the court must give the parties an opportunity to present evidence on the issue before imposing joint custody.[13]

Similarly, in *Hill*, both parties requested sole custody, neither party requested joint physical custody prior to trial, and both parties presented evidence on their requests for sole custody.[14] The only evidence presented on joint custody was testimony from the father that, while he wanted sole custody, he was willing to perform under a joint custody arrangement if ordered.[15] Nevertheless, the trial court awarded joint physical custody.[16] Utilizing our holding in *Zahl*, the Court of Appeals reversed the trial court's decision, concluding the trial court had abused its discretion in not giving the parties an opportunity to present evidence on the issue before imposing joint physical custody.[17]

The instant case is distinguishable from the facts of *Zahl* and *Hill*. Unlike the parties in those cases, Marissa and Caleb had notice prior to trial that joint custody was at issue. In the complaint, Marissa asked for "[j]oint legal custody," did not request a specific physical custody arrangement, and provided that both parents were capable of providing support for the children and were fit and proper people to have care, custody, and control of the children. In his May 11, 2017, proposed parenting plan which was signed by Marissa, Caleb requested that the "parties . . . share joint legal and physical custody of the minor children." This plan proposed designating both Marissa's and Caleb's homes as the children's principal residences and contained references to the parties' ability to coordinate adjustments to the schedule and discuss parenting decisions with

---

[13] See *id.*

[14] *Hill, supra* note 4.

[15] *Id.*

[16] *Id.*

[17] *Id.*

each other. Finally, in his May 23 motion for temporary orders, Caleb again sought joint legal and physical care, custody, and control of the children. Accordingly, these filings provided Marissa and Caleb reasonable notice unlike the complete lack of prior notice in *Zahl* and *Hill*.

Moreover, it is clear from the record that Marissa understood joint physical custody was at issue during the trial. As the first witness, Marissa responded to direct examination from her counsel questioning whether she believed "a shared custody arrangement where [she would] split time" with Caleb was in the children's best interests. Testifying she did not believe such shared custody was appropriate, Marissa explained the reasons why she did not support joint custody, namely her opinion that Caleb rushed into a new relationship with another person with children and her belief that she was the primary caretaker of the children while they were married. In closing arguments, Marissa's counsel again addressed the question of joint physical custody, arguing this case is not appropriate for joint custody or a shared custody arrangement "as clearly there's enough conflict in here that that could create a problem for the children" and cause a "significant upheaval" of the children's current structure, which was working.

Considering all of the above, Marissa had reasonable notice that joint custody was at issue during the trial, had an opportunity to be heard on the issue of joint custody during the trial, and presented evidence on the issue of joint custody during the trial. As such, the district court did not err in considering joint physical custody.

## DOMESTIC ABUSE DETERMINATION

Marissa argues awarding joint physical custody constituted an abuse of discretion because Caleb testified that he "open hand smacked" Marissa once during the parties' marriage and punched holes in the basement walls. Marissa argues this testimony established Caleb committed domestic intimate partner abuse against her. However, the district court determined

this was not a domestic abuse case as defined by Nebraska's Parenting Act. As such, the court made no additional findings pursuant to Neb. Rev. Stat. § 43-2932(3) (Reissue 2016).

Nebraska's Parenting Act establishes certain requirements for the development of a parenting plan in cases where a parent is found to have committed child abuse or neglect, child abandonment, or domestic intimate partner abuse or to have interfered with the other parent's access to the child.[18] Section 43-2932(3) explains the additional requirements if a court determines a parent committed domestic abuse, stating:

> If a parent is found to have engaged in any activity specified in subsection (1) of this section, the court shall not order legal or physical custody to be given to that parent without making special written findings that the child and other parent can be adequately protected from harm by such limits as it may impose under such subsection. The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time, visitation, or other access to that parent will not endanger the child or the other parent.

Under Neb. Rev. Stat. § 43-2922(8) (Reissue 2016), "[d]omestic intimate partner abuse" means an act of abuse as defined in Neb. Rev. Stat. § 42-903 (Reissue 2016) and a pattern or history of abuse evidenced by one or more of the following acts:

> Physical or sexual assault, threats of physical assault or sexual assault, stalking, harassment, mental cruelty, emotional abuse, intimidation, isolation, economic abuse, or coercion against any current or past intimate partner, or an abuser using a child to establish or maintain power and control over any current or past intimate partner, and, when they contribute to the coercion or intimidation of an intimate partner, acts of child abuse or neglect or

---

[18] § 43-2932.

threats of such acts, cruel mistreatment or cruel neglect of an animal as defined in section 28-1008, or threats of such acts, and other acts of abuse, assault, or harassment, or threats of such acts against other family or household members.

The first sentence of § 43-2922(8) directs us to § 42-903(1)(a) to determine if domestic abuse occurred. Section 42-903(1)(a) defines "[a]buse" as "[a]ttempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument" to a family or household member. Spouses and former spouses are considered household members.[19]

Returning to § 43-2922(8), we must examine the remainder of the factors which would require the making of special written findings. After identifying an act of abuse per § 42-903(1)(a), the rest of § 43-2922 is puzzling. The language indicates that the act of abuse previously identified must be coupled with a "pattern" or "history," suggesting that before the factual findings are required, the Legislature wanted more than one act of abuse.[20] In contrast, § 43-2922 also states "one" act, suggesting perhaps a single act of abuse would trigger the requirement for specific factual findings. There are further interpretations not posited here.

Because of the word "and" before "pattern" or "history," we believe the most logical reading of § 43-2922 is that there must be more than one act of abuse. However, if the Legislature intended that one act be sufficient, it can revise the statutory language.

However, we need not resolve the tension here to determine there was a failure of proof before the trial court. In this case, no evidence was received that Caleb's actions caused or were intended to cause bodily injury or placed Marissa in fear of such injury and the record does not demonstrate a pattern or history of similar acts.

---

[19] See § 42-903(3).

[20] See § 43-2922(8).

As to the slapping incident, Caleb testified that he "open hand smacked" Marissa at one point during their relationship due to a disagreement which occurred "so far in the past." He did not recall any other surrounding circumstances and provided no testimony on the cause, effect, or intent of the action. While Marissa answered "Yes" to questioning as to whether Caleb "slapped [her] at some point during the relationship," she offered no other testimony or evidence on the incident.

Though we agree that an "open hand smack[]" may intend, cause, or place someone in fear of the requisite bodily injury, we have no evidence that such was the case here. There is no testimony on the severity, effect, or surrounding circumstances on which we can rely to determine the intention or result of the action. No evidence was adduced as to any redness, bruising, swelling, or other injury sustained. Marissa never contended that Caleb placed her in fear of bodily injury or in fear for her or the children's safety.

In addition, there is no testimony of a pattern or history of similar actions. An appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[21] Without more, we cannot say the district court erred in its determination that the testimony on the "open hand smack[]" did not amount to domestic intimate partner abuse.

The record is similarly void of details as to the circumstances surrounding Caleb's punching holes in the basement wall. Caleb testified that he punched these holes 2 or 3 years prior to trial, explaining, "An argument, I honestly do not recall what it was about, escalated; and I just — I got really angry. So I walked away. I went into the basement of the marital home, and I punched the wall." Although Caleb testified the children were in the house, he explained they were not with him when he punched the wall. No other testimony

---

[21] See *Erin W., supra* note 1.

or evidence was received on when this occurred, the context of the argument, if anyone else was in the basement, how long after the argument took place Caleb punched the wall, whether Caleb had a history of similar acts, or any other information that would inform whether Caleb intentionally placed Marissa in fear of bodily injury. Again, on the record before us, we cannot say the district court erred in its determination that the testimony on Caleb's punching holes in the basement wall did not amount to domestic intimate partner abuse.

### Sufficiency of Evidence

Marissa assigns the court abused its discretion in awarding joint physical custody, arguing the evidence presented at trial did not justify such an award. Specifically, Marissa claims the evidence demonstrated the parties' relationship was "replete with conflict."[22]

[9] Marissa is correct that we have said joint physical custody must be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars.[23] However, we have also noted that § 42-364(3)(b) specifically provides that a court may order joint custody "if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent."[24] And we have affirmed a trial court's decision not to modify an award of joint legal custody even though the evidence showed that the parties

---

[22] Brief for appellant at 12.

[23] See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[24] Accord *Leners v. Leners*, 302 Neb. 904, 925 N.W.2d 704 (2019).

continued to have difficulty communicating and cooperating with one another.[25]

In this case, there was sufficient evidence to support the court's determination that joint custody was in the children's best interests. Marissa and Caleb testified that both parties watched and cared for the children during the parties' relationship. Both parties explained that they have been communicating and working together civilly while the temporary custody order has been in place and have each made accommodations for the other with regard to the children's care. Marissa and Caleb detailed that when the children got chicken pox and lice during the pendency of these proceedings, Marissa communicated the issues to Caleb, Caleb took them to treatment, and Marissa and Caleb communicated about the implementation of the treatment. There was testimony concerning the parties' decision not to vaccinate the children and Caleb's openness to do so in the future, but nothing in the record or decree demonstrates that the court relied on this testimony in making its physical custody determination. Although Marissa testified that she did not believe joint custody was appropriate due to Caleb's new relationship and her being the children's primary caretaker, Caleb testified that joint custody would be a viable option that he would be willing to work for utilizing "[c]ommunication" and "open mindedness."

As previously stated, an appellate court reviews de novo on the record the trial court's determinations of custody; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.[26] Taking into account that the trial judge heard and observed the witnesses and the evidence presented[27] on the parties' relationships with their children, ability

---

[25] See *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015).

[26] *Erin W., supra* note 1.

[27] See *id*.

to parent, communication, and history of working together for the children's care, the district court did not err in determining that joint custody was in the children's best interests.

## Division of Decisionmaking Authority

Marissa makes an additional argument in her brief that the court's division of final decisionmaking authority, which awarded Marissa final authority over education issues and Caleb final authority over health and religion issues, is "entirely counter to the law regarding joint custody."[28] Marissa makes no specific argument on why such division is improper, and her assignments of error challenge only the court's award of joint physical custody. Nevertheless, the court acted within its authority in dividing the final decisionmaking duties between the parties.

[10] "Joint legal custody" is the mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health.[29] A trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests.[30]

[11,12] The best interests of the child are the primary consideration for developing custodial plans. In considering such best interests, it is a common occurrence and a court is permitted to supply a party with final decisionmaking authority in some areas to avoid future impasses which could negatively affect the child while maintaining both parents' rights to consultation and participation in important decisions.[31] Such grants of

---

[28] Brief for appellant at 12.

[29] § 43-2922(11).

[30] § 42-364(3).

[31] See, e.g., *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017); *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

final decisionmaking authority were made in this case, and we find no violation of the court's discretion to do so.

## CONCLUSION

The parties had sufficient notice and opportunity to be heard on the issue of joint physical custody, and the record fails to establish by a preponderance of the evidence that this is a domestic abuse case requiring additional findings under § 43-2932(3). As such, and because there was sufficient evidence to support the court's finding that joint physical custody is in the children's best interests, the district court did not err in awarding joint physical custody. Accordingly, we affirm.

Affirmed.

Miller-Lerman, J., concurring.

I concur with the majority reading of Neb. Rev. Stat. § 43-2922 (Reissue 2016) to the effect that before special findings under § 43-2922 are required, the evidence must show an act of abuse as defined in Neb. Rev. Stat. § 42-903 (Reissue 2016) and, in addition (per § 43-2922), a pattern or history of abuse.

The majority concludes that there was not sufficient evidence to find an act of abuse under § 42-903 on this record. I disagree.

Section 42-903(1)(a) defines "[a]buse" as, inter alia, "[a]ttempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument" to a family or household member.

On this record, both parties agree that during a "[d]isagreement," Caleb "slapped" or "open hand smacked" Marissa.

I believe these undisputed facts show that Caleb was "[a]ttempting to cause . . . bodily injury," § 42-903(1)(a), and therefore, that "an act of abuse" for purposes of § 43-2922 was shown. However, because there was no "pattern" or "history" as those terms are used in the text of § 43-2922, I agree with

the majority that the court was not required to make special findings under § 43-2922.

Papik, J., concurring.

I agree with the court's determination that the district court was not required to make special written findings under Neb. Rev. Stat. § 43-2932 (Reissue 2016) because the record did not show that Caleb committed domestic intimate partner abuse. While the court reaches that conclusion by finding a lack of evidence that a slap caused bodily injury or was an attempt to cause bodily injury, I write separately to note that I would reach the same conclusion via a different route.

As the court points out, domestic intimate partner abuse is defined by Neb. Rev. Stat. § 43-2922(8) (Reissue 2016) as follows:

> [A]n act of abuse as defined in section 42-903 and a pattern or history of abuse evidenced by one or more of the following acts: Physical or sexual assault, threats of physical assault or sexual assault, stalking, harassment, mental cruelty, emotional abuse, intimidation, isolation, economic abuse, or coercion against any current or past intimate partner, or an abuser using a child to establish or maintain power and control over any current or past intimate partner, and, when they contribute to the coercion or intimidation of an intimate partner, acts of child abuse or neglect or threats of such acts, cruel mistreatment or cruel neglect of an animal as defined in section 28-1008, or threats of such acts, and other acts of abuse, assault, or harassment, or threats of such acts against other family or household members.

The court suggests that a single act of abuse under Neb. Rev. Stat. § 42-903 (Reissue 2016) might qualify as domestic intimate partner abuse under one possible interpretation of this definition. While the court does acknowledge that this is not the most logical reading, I would go further and hold that the text cannot be interpreted in this way.

The definition of domestic intimate partner abuse has two elements separated by the word "and." § 43-2922(8). The first element is an act of abuse under § 42-903. The second element is a "pattern or history of abuse." § 43-2922(8). The statute goes on to provide that the second element, the pattern or history of abuse, must be evidenced by "one or more" of a number of enumerated acts, some of which again include the word "abuse." *Id.* If, however, a single instance of abuse could count as the act of abuse for the first element and establish the requisite pattern or history, the pattern or history element of the statute would serve no purpose. This runs counter to our practice of giving effect to all parts of a statute and rejecting interpretations that would render parts of the statute superfluous. See *State v. Clemens*, 300 Neb. 601, 915 N.W.2d 550 (2018).

I can see only one way that this statute could be interpreted to allow for a single instance of abuse to satisfy the definition: to give the word "and" separating the two elements of the definition discussed above a disjunctive rather than conjunctive meaning. See § 43-2922(8). We do have some precedent for departing from the ordinary, grammatical meaning of "and" and "or" in some cases. We have said that we may do so where "a strict reading would lead to an absurd or unreasonable result and defeat the intent of the statute." See, e.g., *Hoiengs v. County of Adams*, 245 Neb. 877, 900-01, 516 N.W.2d 223, 240 (1994).

I have some questions about how judges are to go about determining that a particular policy result is absurd or unreasonable given that it is the Legislature's function to declare public policy rather than ours. See, e.g., *Mays v. Midnite Dreams*, 300 Neb. 485, 915 N.W.2d 71 (2018). See, also, John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003). It seems to me that this practice can be squared with the judiciary's role in a system of separated powers only if it is limited to instances in which the result of applying the grammatical meaning of the text is so bizarre that the Legislature

could not possibly have intended it. See Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 237-38 (2012).

I cannot say that the result reached by interpreting this statute to mean what it says meets this test. While there are undoubtedly policy arguments for imposing the additional parenting plan requirements of § 43-2932 even when there has been a single act of abuse, it is not unthinkable that the Legislature would require both an act of abuse and a pattern or history before imposing these requirements. Drawing the precise line at which these requirements apply strikes me as a matter of legislative judgment, which is subject to reconsideration not by this court, but, if it so chooses, by the Legislature.

Because I do not understand the requirements of § 43-2932 to be triggered by a single act of abuse, I do not believe the statute applied in this case. There was evidence that Caleb slapped Marissa, but Marissa has not shown us additional evidence sufficient to demonstrate a pattern or history. I would affirm the decision of the district court on this basis.