IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

HIGGINS V. CURRIER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BILLY MEREDITH HIGGINS, APPELLEE,

V.

RASHELL RENE CURRIER, APPELLANT.

Filed February 11, 2020.    No. A-19-343.

Appeal from the District Court for Douglas County: JAMES M. MASTELLER, Judge. Affirmed.

Corey J. Wasserburger, of Johnson, Flodman, Guenzel & Widger, for appellant.

Richard W. Whitworth and Megan E. Shupe, of Reagan, Melton & Delaney, L.L.P., for appellee.

MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

MOORE, Chief Judge.

## INTRODUCTION

Rashell Rene Currier appeals from the order of the district court for Douglas County, which dissolved her marriage to Billy Meredith Higgins. On appeal, she challenges certain aspects of the court's division of the marital estate. Because the court did not abuse its discretion in determining, valuing, and dividing the marital estate, we affirm.

## BACKGROUND

The parties were married May 20, 2016, in Washington. They have no children together; Currier has a son from a previous relationship. At the time of the marriage, Currier and her son lived in Washington, and Higgins lived in Council Bluffs, Iowa. Following the marriage, Currier and her son moved to Council Bluffs to live with Higgins, who paid for their relocation. Higgins

- 1 -

has been employed by TD Ameritrade since 1997. During the 14 months she resided with Higgins, Currier had part-time employment between October 2016 and February 2017 and she deposited her monthly child support of $700 "into the bank account." In July 2017, Currier and her son moved back to Washington, and Higgins again paid for their relocation. Shortly thereafter, Higgins moved to Omaha, Nebraska. After July 2017, the parties continued their relationship long distance, continued to work on their marriage, and continued to take trips to visit one another. Higgins also continued to provide financial support to Currier. The parties were unable to reconcile, however, and ended their relationship in March 2018.

On April 16, 2018, Higgins filed a complaint for legal separation in the district court. On August 20, he filed an amended complaint for dissolution of marriage, after having resided in Nebraska for more than 1 year. Currier filed an answer and counterclaim for legal separation in response to the initial complaint, but the record does not show that she filed an answer to the amended complaint.

Trial was held December 4, 2018. Higgins was represented by counsel, and Currier appeared pro se. Both parties testified about the items of property at issue in this appeal and offered exhibits, which were received by the district court.

During the time the parties resided together, they lived in a house located in Council Bluffs (the Iowa property), which Higgins testified that he purchased in 2014 for approximately $673,000. Higgins testified that at the time of the purchase, the Iowa property was appraised at $625,000, and that amount is reflected in a June 2014 appraisal admitted into evidence. Higgins testified that he made a downpayment on the purchase of about $350,000. A closing statement for the amount borrowed on the home shows that Higgins and his previous wife borrowed $315,000. Following the parties' marriage, Currier was never listed on any of the financing documents for the Iowa property, and her name was never placed on the deed to it. Although Higgins was the one who made the payments for the loan, taxes, and insurance on the Iowa property, there is nothing in the record to suggest that the payments made by Higgins for those obligations during the marriage were paid with anything other than marital funds. As noted above, Currier was employed for a short period during the marriage and also received child support payments. When asked about the mortgage payments at trial, she testified that the parties' bills were paid with "mixed funds."

At Currier's request, Higgins' placed the Iowa property on the market because the parties had intended to move to Omaha so that Currier's son could attend school there. The Iowa property sold on July 14, 2017, for $615,000, which according to Higgins' calculations was "about $58,000" less than he paid for its purchase in 2014. The closing statement for the 2017 sale shows that Higgins incurred and paid closing costs of $31,593.20 and that he received net proceeds from the sale of the Iowa property of $300,019.81. The district court received an exhibit from Higgins showing his calculation of a loss totaling $89,953.20 on the sale of the Iowa property. Following the sale of the Iowa property, Higgins used $25,000 of the proceeds to pay off a marital credit card debt. He applied the balance of the proceeds to the purchase of a new residence in Omaha (the Omaha property). Higgins asked the court to award him the Omaha property as nonmarital property traceable to his premarital Iowa property. He testified that Currier did not "provide any of her funds for the support of the [Omaha] household."

Higgins had certain TD Ameritrade accounts, although the record is not clear as to how many; at least one account was in existence prior to the parties' marriage. Higgins testified that the TD Ameritrade "account ending in 3733" had been open since 1997. According to Higgins, in an attempt to resolve the discord between them, he had Currier's name added to the "3733" account. He testified, however, that she was not given the right to individually access that account and that he had no intent to make her a gift of the asset. Higgins testified that neither party made any deposits into that brokerage account during the marriage and that he had not put any money into it since Currier returned to Washington. He asked the court to "make an equitable determination that all of the funds in that account should be awarded to [him] since it was all accumulated on [a] premarital asset." He indicated that the only other TD Ameritrade account on which Currier's name had appeared had been closed.

Higgins also had a 401K account through TD Ameritrade established prior to the marriage, which he asked the court to award to him. Higgins did not provide any other testimony or any documentation with respect to this retirement account, but according to Currier, Higgins was putting a total of $1,500 per month into two different 401K accounts, which Currier felt was "money that could have been put towards school and the investment of educating [her] and allowing [her] to get a job and contribute to the household." The district court received an exhibit containing pay statements for Higgins, which Currier offered to show that Higgins "claimed three on his taxes, because we were together and he got more back for us instead and did not share it." In her arguments on appeal, Currier notes that this exhibit reflects contributions by Higgins to a "401K" and a "Roth 401K" during the marriage.

The district court also received two account statements offered by Currier for a 401K account ending in "0510" from May 2016 and March 2018. These statements show that the "0510" account had a value of $218,182.02 as of May 1, 2016, and a value of $359,128.29 as of March 31, 2018. The statements show that the account contains a mixture of stocks and mutual funds. Both statements show that no funds were deposited or disbursed year-to-date (through May 2016 and through March 2018). The statements show that securities were sold and purchased within the account and interest income was received. Currier asked the court to equitably divide that 401K account.

There was also evidence about a bank account at U.S. Bank that Higgins had opened when he was a minor. Currier's name was placed on that account after the parties were married. Higgins utilized this account to pay monthly car payments, car insurance, and credit card bills for the benefit of Currier after she returned to Washington, as well as his payment for her to move to Iowa and then back to Washington. The district court received an exhibit containing bank statements from this account, which was closed shortly before Higgins filed the initial complaint in this case. The balance in this account at the time it was closed was $606.

The parties filed a joint income tax return for the tax year 2016, which resulted in a tax refund of $11,514. The entirety of the refund was intercepted by the U.S. Department of Education for Currier's student loan debts, but it was subsequently returned to Higgins as "Injured Spouse support."

On March 8, 2019, the district court entered a decree of dissolution, dissolving the parties' marriage and determining and dividing the marital estate. The court found that "the equity in the

real property can be traced from the sole asset of [Higgins]" to the Omaha property, which the court found to be a nonmarital asset. Accordingly, the court awarded the Omaha property to Higgins as his nonmarital property. The court found that the TD Ameritrade account ending in "0733" (presumably the "3733" account referenced in Higgins' testimony) was Higgins' premarital asset and that "all accumulations to [that] account were from that premarital asset." The court awarded Higgins the TD Ameritrade brokerage accounts, which belonged to him prior to the marriage, as his premarital assets and ordered that Currier's name be removed from the "0733" account. With respect to Higgins's premarital 401K account, the court determined that the $1,500 monthly deposit during the marriage was made with marital funds, but the court noted that neither party presented testimony concerning how to trace the interest on the marital contributions to that account. The court found that for purposes of dividing the marital portion of the 401K account, the relevant period was from May 20, 2016, to July 31, 2017, during which time Higgins deposited $21,000 into the account. The court awarded Currier $10,500, representing half of the amount deposited during the parties' marriage and ordered that it be transferred to her through a Qualified Domestic Relations Order. The court awarded the parties any other retirement plans that either might have. The court awarded Currier $303, half of the balance in the U.S. Bank account at the time the complaint was filed. The court also awarded her $3,570, a sum representing "50% of the [2016 income tax] refund that accumulated from May 20, 2016 to December 31, 2016." The court also made determinations with respect to tangible personal property, debt, and other matters not relevant to the present appeal.

## ASSIGNMENTS OF ERROR

Currier asserts that the district court abused its discretion by (1) classifying the sale proceeds from the marital residence in Iowa as a nonmarital asset and failing to award her one-half of those proceeds, (2) determining the marital value of Higgins' 401K and failing to award Currier one-half of the increase in value that occurred during the marriage, (3) failing to award Currier one-half of the refund from the parties' 2016 income tax return, and (4) failing to identify Higgins' accumulated paid time off as a marital asset and to award one-half of that value to Currier.

## STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). A judicial abuse of discretion exists when reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.* When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

- 4 -

ANALYSIS

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* Currier presents arguments relating to all three steps in this process.

Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Where there is nothing on the record to show the source of premarital funds, they should be considered part of the marital estate. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). The burden of proof rests with the party claiming that property is nonmarital. *Dooling v. Dooling, supra*.

*Sale Proceeds from Iowa Property.*

First, Currier asserts that the district court abused its discretion by classifying the sale proceeds from the marital residence in Iowa as a nonmarital asset and failing to award her half of those proceeds. Currier argues that the sale proceeds of the Iowa property should have been characterized as a marital asset because Higgins failed to produce evidence of the amount of equity he had in the property at the time of marriage and because "whatever premarital interest he may have held in the [Iowa property] was inextricably commingled with the parties' marital funds through the mortgage payments that were made during the parties' marriage." Brief for appellant at 16.

In support of her first argument, Currier relies on *Burgardt v. Burgardt*, 27 Neb. App. 57, 926 N.W.2d 452 (2019) (*Burgardt I*), which was reversed and remanded with directions subsequent to the filing of the brief in the present case. See *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019) (*Burgardt II*). In *Burgardt I*, this court found that the husband did not meet his burden of proving that his 401K plan had a value of $130,000 at the time of the marriage and did not prove the amount he inherited from his father (husband testified that his inheritance was $60,000). On further review by the Nebraska Supreme Court, the husband asserted that this court erred in determining that because he offered no documentary evidence at trial, he failed to meet his burden to prove the premarital values of his 401K and of the inheritance he received during the marriage.

The Nebraska Supreme Court first addressed the necessity of documentary evidence, noting that a nonmarital interest in property may be established by credible testimony. *Burgardt II, supra*. The court noted further that triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Id.* The court stated, "While documentary evidence may be more persuasive, it is not absolutely required. . . . Of course,

a party opting to rely upon his or her testimony alone does so at the risk of nonpersuasion." *Id.*, 304 Neb at 365, 934 N.W.2d at 495.

The Supreme Court in *Burgardt II* noted *Onstot v. Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018), in which it affirmed a trial court's decision not to grant credit for the premarital value of a residence where the husband neither testified nor provided documentation as to whether, or to what extent, the property was encumbered at the time of the marriage. The court also noted *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016), where it affirmed the trial court's decision not to set off a premarital portion of the husband's checking accounts, crops from a particular harvest, and machinery owned at the time of the marriage. The *Burgardt II* court observed, "A party seeking recognition of nonmarital property may find it easier to meet his or her burden of persuasion with documentary support. But its absence does not automatically defeat the claim." 304 Neb. at 366, 934 N.W.2d at 496. The *Burgardt II* court concluded by stating:

> It is axiomatic that an item must be identified in order to be set off as nonmarital. But its value need not be definitively or conclusively proved; the greater weight of the evidence is sufficient. In other words, the value of the nonmarital portion of an asset must be established by the greater weight of the evidence.

*Burgardt II*, 304 Neb. at 366-67, 934 N.W.2d at 496. The court reviewed the testimony about the values of the two assets at issue and found no abuse of discretion by the trial court setting off to the husband the values identified in his testimony, which the trial court evidently found to be credible.

In the present case, the district court apparently found Higgins' testimony to be credible regarding the purchase price of the Iowa property, his down payment, the mortgage indebtedness, the sale price, and the loss realized from the sale. We also note that Higgins did provide some documentary proof to corroborate his testimony. In our de novo review of the record, we find no abuse of discretion by the trial court in setting aside the Omaha property, purchased with proceeds from Higgins' premarital Iowa property, to Higgins as nonmarital property.

*Valuation and Division of Marital Portion of 401K.*

Next, Currier asserts that the district court abused its discretion by determining the marital value of Higgins' 401K and failing to award Currier one-half of the increase in value that occurred during the marriage. The court noted that the parties did not provide evidence about how to trace the interest on the contributions to Higgins' 401K during the marriage, but it determined that Higgins' contributions of $1,500 per month were made with marital funds and that between May 20, 2016, and July 31, 2017, Higgins deposited $21,000. The court awarded Currier $10,500, which is half of that amount.

Under Neb. Rev. Stat. § 42-366(8) (Reissue 2016), the general rule is that amounts added to and interest accrued on pension or retirement accounts which have been earned during the marriage are part of the marital estate, but contributions before marriage or after dissolution are not assets of the marital estate. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Investment earnings accrued during the marriage on the nonmarital portion of a retirement account may be classified as nonmarital where the party seeking the classification proves: (1) The growth

is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is due solely to inflation, market forces, or guaranteed rate rather than the direct or indirect effort, contribution, or fund management of either spouse. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017). The active appreciation rule sets forth the relevant test to determine to what extent marital efforts caused any part of the appreciation or income. *Id.* Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property. *Id.* Passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id.* The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.* Appreciation or income of a nonmarital asset during the marriage is marital insofar as it was caused by the efforts of either spouse or both spouses. *Id.*

Currier argues that Higgins failed to meet his burden of proving that the 401K account's increase in value beyond Higgins' contributions during the marriage was from a nonmarital source, and therefore this increase should be considered part of the marital estate. In support of her argument, she points to exhibit 13 offered by her at trial, which was the account statements showing that the "0510" account had a value of $218,182.02 as of May 1, 2016, and a value of $359,128.29 as of March 31, 2018. She also relies on exhibit 12 offered by her at trial, which was the pay statements showing that Higgins made contributions to two 401K accounts from his wages, and her own testimony that he made contributions totaling $1,500 per month to two accounts. Currier argues that under the rules cited above, the district court was obligated to treat the entirety of the increase in value of the "0510" account that occurred during the marriage as marital because Higgins failed to prove that the growth was readily identifiable and traceable to the nonmarital portion of the account and was due solely to inflation, market forces, or guaranteed rate rather than the direct or indirect effort, contribution, or fund management of either spouse.

One problem with Currier's arguments is that it is difficult to tell from the record exactly how many 401K accounts Higgins has and whether the "0510" account represented in exhibit 13 is one of the accounts represented in exhibit 12 and Currier's testimony. Higgins simply testified that he had a 401K prior to the marriage, and it is not possible to discern whether the account he was testifying about was one of the accounts represented in Currier's evidence. The record supports a conclusion that Higgins contributed to one or more 401K accounts, shown as deductions from his earnings on his pay stub, during the marriage. The district court credited Currier's testimony that $1,500 per month was contributed by Higgins, and it determined the total marital contribution to be $21,000 and awarded Currier $10,500.

With regard to the 401K account ending in "0510," however, the exhibit offered regarding this account does not show any funds deposited during the relevant time periods; rather the statements show stocks and mutual funds being sold and purchased within the account as well as interest income. The March 31, 2018, statement shows over a $20,000 loss for the month. Thus, the limited evidence adduced regarding this account does not indicate that active appreciation is the cause of the increase in value during the marriage; rather, it indicates that the account fluctuates, presumably depending on market forces. Again, the district court apparently credited Higgins' testimony that his 401K account was premarital property, and although the "0510" account increased in value during the parties' short marriage, under the circumstances of this case,

we cannot say that the court abused its discretion in declining to include in the marital estate any increase in value realized during the marriage on this 401K account owned by Higgins.

*Division of Income Tax Refund.*

Next, Currier asserts that the district court abused its discretion by failing to award her one-half of the refund from the parties' 2016 income tax return. The parties received a refund of $11,514 that was initially intercepted for payment of Currier's student loan debts but was later returned to Higgins as an injured spouse. The court awarded Currier $3,570 of the refund, intended to represent "50% of the refund that accumulated from May 20, 2016 [the date of the marriage] to December 31, 2016." Currier argues that it was arbitrary and speculative for the court to prorate the division of the refund in this way, given that the parties filed a joint income tax return that produced a refund, and since Higgins benefitted from claiming Currier and her son as dependents. The record shows that Higgins has been employed at Ameritrade since 1997 and there is nothing to indicate that he did not work for the entire year in 2016. Currier was employed for a few months at the end of the year. The parties were married for a little over half of 2016. Under the circumstances of this case, we find no abuse of discretion in the court's division of the income tax refund.

*Higgins' Accumulated Paid Time Off.*

Finally, Currier asserts that the district court abused its discretion by failing to identify Higgins' accumulated paid time off as a marital asset and to award her one-half of that value. She points to pay statements she offered at trial, showing that Higgins had 200 hours of accumulated paid time off as of June 2, 2017. She cites to *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019), where the Nebraska Supreme Court held that to the extent that employment benefits such as unused sick time, vacation time, and compensatory time have been earned during the marriage, they constitute deferred compensation benefits under § 42-366(8) and are considered part of the marital estate subject to equitable division. In *Dooling*, the trial court awarded the wife a portion of the husband's vacation and comp time earned during the marriage, and the husband assigned error to the calculation and division of that marital asset. In the present case, Currier did not raise this issue before the trial court. The exhibit in question was offered in connection with her arguments about Higgins' 401K account or accounts, and Currier specifically offered the exhibit to show that Higgins "claimed three on his taxes, because we were together and he got more back for us instead and did not share it." Because the issue of the valuation and division of any accrued paid time off earned by Higgins during the marriage was not presented to or passed upon by the trial court, we do not address it further. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the administrative agency. *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019).

CONCLUSION

The district court did not abuse its discretion in determining, valuing, and dividing the marital estate.

AFFIRMED.