IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


MANKA V. MANKA


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


ERIC L. MANKA, APPELLEE,

V.

KELLY R. MANKA, NOW KNOWN AS KELLY R. SELF, APPELLANT.


Filed November 19, 2019.    No. A-19-199.


Appeal from the District Court for Hall County: JOHN H. MARSH, Judge. Affirmed.

Mary J. Livingston for appellant.

Jennifer D. Kearney and Marvin L. Andersen, of Bradley Law Office, P.C., for appellee.


MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Kelly R. Manka, now known as Kelly R. Self, and Eric L. Manka were divorced in 2012, and Kelly received legal and physical custody of the parties' daughter, Bailey Manka. In 2016, Eric filed a complaint to modify custody, and after a trial, the Hall County District Court awarded the parties joint legal and physical custody of Bailey, with Eric having final decisionmaking authority. Kelly appeals. We affirm.

## II. BACKGROUND

### 1. PROCEDURAL BACKGROUND

Kelly and Eric were divorced in March 2012. According to the parties' pleadings (original decree not included in our record) and the order entered by the Hall County District Court in October 2018, the divorce decree granted Kelly legal and physical custody of Bailey (born in

2009), subject to Eric's parenting time which included every other weekend, a few hours every Wednesday evening, as well as holidays and extended time in the summer. Eric was ordered to pay child support.

On July 13, 2016, Eric filed a complaint to modify custody, child support, and parenting time. He alleged a material change of circumstances had occurred since the date of the decree, namely that Kelly was no longer able to provide the emotional and psychological support needed by Bailey and that Bailey's continued placement with Kelly would cause irreparable physical and mental harm. Eric alleged that it would be in Bailey's best interests to be placed in his custody. He asked the district court to award him legal and physical custody of Bailey, and to order Kelly to pay child support. In her answer, Kelly generally denied Eric's allegations. Kelly also alleged, as an affirmative defense, that issues of her parental fitness and Bailey's safety and best interests were "res judicata" in that those issues were decided in a separate juvenile case.

## 2. TRIAL

The modification trial was held on April 12 and September 13, 2018. The evidence from trial revealed the following.

### (a) Law Enforcement Investigations

In August or September of 2012 (following the parties' March divorce), Dustin Friesen, a deputy with the Clay County Sheriff's Office, received an intake from the Nebraska Department of Health and Human Services (DHHS) alleging child abuse and neglect of Bailey. Deputy Friesen set up an interview for Bailey at the Child Advocacy Center (CAC). The CAC interview took place around September 5th, and Deputy Friesen was able to observe the interview from another room. During the interview, Bailey (not quite 3 years old at the time) was "not really" able to answer questions consistently; "[s]he was quiet a lot of times," and "[i]t was kind of hard to understand what she was saying." Bailey did not make any disclosures of abuse. During her testimony, Kelly claimed that she saw the video from the CAC interview and said that Bailey did make a disclosure. However, Kelly did not present the video to the district court for review, nor does it otherwise appear in our record.

Deputy Friesen stated there were a total of eight intakes during his investigation, and "[t]he majority of the reports were from Kelly." One was after Bailey was taken to the hospital in Grand Island, Nebraska, on September 23, 2012, where a sexual assault examination was done by a Sexual Assault Nurse Examiner (SANE).

Jason Allan, a Sergeant with the Grand Island Police Department, testified that on September 23, 2012, he was called to the St. Francis emergency room on a report of possible child abuse. At the hospital, Kelly reported that after Bailey came back from visitation, she "mentioned her butt hurt." Kelly "inspected the area and didn't see any injury, but then during bath time . . . she noticed the rug burn or whisker burns at the inner thighs." Kelly also stated that over the past few months, she noticed a change of behavior; Bailey had been "talking about boobies, lifting her shirt, trying to grab at Kelly's breasts, pulling down her sibling's pants or trying to pull down Kelly's pants." And Kelly reported that Bailey had been to the doctor a few times for yeast infections.

On September 23, 2012, Sergeant Allan observed "Dr. Griego" complete a "sexual assault exam" of Bailey using "one of the sexual assault kits that the hospital has." The exam involved swabs of Bailey's mouth, vaginal area, and rectal area; photographs were also taken. When asked what Dr. Griego told him about her findings, Sergeant Allan said, "[Dr. Griego] saw a small amount of redness on the top of Bailey's rectal area, a scratch on her back, and bruise on one of her knees, redness in her thighs, I believe, but she didn't come to any conclusions. She just said what her findings were, what she saw." When asked if there were any injuries to Bailey's vaginal area or rectum, Sergeant Allan responded, "No." Sergeant Allan later placed the sealed kit in the evidence refrigerator at the police department. Following the collection of evidence, he had no further involvement in the case.

Eric testified that in September or October 2012, he received a call from Deputy Friesen informing him that sexual assault allegations had been made against him, and that Bailey had been taken to the hospital and a "rape kit" had been completed. Deputy Friesen testified he met with Eric one time, on October 2, for about 1 hour; Eric was cooperative in answering questions, and Deputy Friesen did not see any cues that indicated Eric was lying. Eric testified that prior to the investigation, Kelly never reached out to Eric to discuss concerns about Bailey's behaviors. Eric had not been aware that there were claims that Bailey was showing sexualized behaviors, and he did not see Bailey demonstrate sexualized behaviors while in his care.

After completing his investigation, Deputy Friesen determined that the intakes were "unfounded because there was no evidence to support any of the claims." On October 3, 2012, he notified Kelly of his findings. Kelly was "upset," "[s]he got loud on the phone," "kept asking questions why," and "couldn't believe that that was the outcome of the case."

Eric testified that following the investigation, further reports were made to the child abuse hotline. "[T]here had been multiple reports. They were that I wasn't feeding [Bailey], that I wasn't bathing her, that I was smoking around her, that she was coming home lethargic, unfed, [and] dirty." There was also a report that Bailey had an injury to her eye. Eric said that DHHS interviewed a number of people and the allegations were deemed "unfounded." Next, there was a report alleging physical abuse. Kelly asked Eric how Bailey got a bruise on her face, and he responded that he did not remember seeing a bruise.

Justin Davis, a trooper with the Nebraska State Patrol, testified that in January 2013 he went to the emergency room at St. Francis Medical Center in response to a call about an alleged child sexual assault. When he got to the emergency room, Kelly told him that she believed Bailey (3 years old at the time) had been sexually assaulted by Eric; Kelly had observed some blood inside Bailey's underwear 3 days prior, which was also when Bailey last had contact with Eric. Trooper Davis learned that there had been a previous investigation, and Kelly informed him that she did not believe enough had been done with previous allegations. Kelly told Trooper Davis that she had taken Bailey to "Dr. Brosz," a pediatrician, in August 2012, and that Dr. Brosz told her that Bailey had been sexually assaulted. In the emergency room in January 2013, Bailey was "visibly scared," "[s]he was pretty worked up especially being there with just the nurses," but "[s]he seemed like she was more comfortable when [Kelly] was in the room." A SANE exam was not done that day because of the amount of time that had passed since the alleged sexual assault. However, Bailey was given a pelvic examination; she had to be held down because "[s]he was struggling with the nurses." During her testimony, Kelly denied that Bailey had to be held down, and said that Bailey

was under a "conscious sedation" at the time. The next day, Bailey was taken for a CAC interview, and Trooper Davis was able to observe the interview from a different room. "[Bailey] didn't want to be in the room. She didn't want to be away from her mother . . . . [A]nd she wasn't comfortable being there." Bailey did not make disclosures of any assaultive behavior. Following the CAC interview, Trooper Davis looked at medical records and past reports. He spoke to Dr. Brosz, Bailey's therapist, and Deputy Friesen; no one was able to confirm Kelly's concerns about physical or sexual abuse. Trooper Davis also interviewed Eric and asked him to take a polygraph examination; Eric "was cooperative through the whole process." Trooper Davis did not testify about the results of the polygraph examination, and the results are not otherwise in our record. Trooper Davis concluded that "there was no factual basis to the allegation" and that Eric was not a suspect. When Trooper Davis informed Kelly of his findings, she "got angry" and said "we hadn't done enough and that we were wrong." He explained to her that the reports always get sent to the County Attorney, and the County Attorney decides whether or not to file charges; Trooper Davis had never been informed of any charges being filed against Eric. And Eric testified that after the investigation he was not charged with anything.

Both Trooper Davis and Deputy Friesen testified they had concerns about Bailey. Trooper Davis testified that he "was a little bit worried, and [he] brought it up in the interview with the counselor about how many intrusive exams were going on with Bailey"; "that takes a toll eventually, especially on a three year old at that time." And Deputy Friesen testified that during a conversation he had with Kelly, she informed him that before Bailey would go on visits with Eric, Kelly "would strip Bailey down, take photos of Bailey and then get her dressed and send her off to the visitation," and "then when [Bailey] would get back from visitation, the same process would happen," "[Kelly] would strip Bailey down, photograph her, bathe her, and dress her."

### (b) Juvenile Case

Eric testified that he was notified by his attorney that a juvenile action was filed regarding Bailey and that the juvenile action contained allegations against Kelly, not him; he did not state when the action was filed. According to Eric, Bailey was made a state ward for 2 years as a result of the juvenile case. After she was made a state ward, Eric was not subject to further investigations by DHHS or contact with law enforcement regarding allegations against him.

Rebecca Wilson is employed by DHHS as a child and family service specialist with protection and safety. The juvenile case had already been filed when Wilson was assigned as the caseworker in March 2014. (Other than Wilson's testimony in this current modification proceeding, we have no record of what occurred in the separate juvenile case.) Prior to Wilson's involvement in the case, there were approximately 13 calls made to the child abuse and neglect hotline, and while calls were made against both Eric and Kelly, the majority were made against Eric; none of the calls made against Eric were substantiated. However, a call alleging that Kelly physically neglected Bailey was considered founded. Kelly was alleged to have been performing vaginal swabs of Bailey and also subjecting her to medical examinations. Bailey was allowed to remain in Kelly's custody, but a safety plan was put in place. Due to concerns of Kelly subjecting Bailey to unnecessary medical treatment, part of the safety plan was that Kelly had to get permission before taking Bailey to the doctor. And at some point, an order was put into place that Kelly had to ask permission prior to taking photographs of Bailey because Kelly had previously

- 4 -

been taking photographs of Bailey, undressed, before and after Bailey spent time with Eric. On cross-examination, Wilson acknowledged that Kelly told her that her actions--the doctor visits, swabbing, and photographs--were based on recommendations from medical personnel or therapists. According to Wilson, Kelly did follow the safety plan. No case plan was set up for Eric in the juvenile case because the focus was on Kelly's home as she was the custodial parent.

Wilson had the opportunity to observe Eric with Bailey on two occasions at Eric's home. Bailey appeared to be bonded to Eric and happy to be spending time with him. There was appropriate interaction between Eric and Bailey, and Bailey never appeared fearful or hesitant around Eric. Wilson was able to speak with Bailey alone at Eric's home, and Bailey never expressed any fears or concerns. Based on her observations, Wilson did not have any concerns about Bailey being in Eric's care.

Wilson observed Bailey with Kelly approximately 20 times. Wilson's "main concern was Bailey feeling comfortable expressing herself" and feeling comfortable talking about the time she spent with Eric and her stepfamily.

According to Wilson, Bailey saw a few different therapists. Bailey made no disclosures of sexual abuse to Wilson or any of the therapists. And Kelly never stated to Wilson that Bailey had made disclosures of sexual or physical abuse; although Kelly told Wilson that Kelly believed sexual abuse was occurring.

Wilson stated that Kelly completed a psychological evaluation in February 2016 (this evaluation is not in our record). Following her review of the evaluation, Wilson was concerned that Bailey was not allowed to have a relationship with Eric, and that because of Kelly's belief that sexual abuse was occurring, Bailey was not able to have a healthy relationship with Eric. Long term, "the continued belief that . . . [Eric] is sexual [sic] abusing Bailey with no evidence that that's happening, then it was just concerning that at some time Bailey may begin to believe it and not want to have a relationship" with Eric. When the juvenile case concluded in April 2016, Kelly continued to believe that sexual abuse was occurring. However, the juvenile case was closed because "[t]here was no immediate safety threat in the home"; Wilson continued to have concerns about Bailey's well-being while with Kelly. Kelly testified that "[Wilson] never shared concerns of any kind with me that she thought that I was a continued issue or a threat to my own daughter with regard to alienation or disrupting Eric's bond or relationship with Bailey." Kelly said that at the last three or four meetings before the case was dismissed, Wilson told her she was a "success story."

(c) Additional Testimony

Kelly testified that she started having concerns about Bailey being abused by Eric in 2012. At the time, Kelly and Eric were alternating parenting time with Bailey on a weekly basis. "The day care would call me on [Eric's] weeks and say Bailey [was] having bloody stools." At first, Kelly thought maybe Bailey was constipated. But "it continued until we finally got the divorce done and I got sole custody and he only had every other weekend visitation." During Eric's first summer visitation of 4 weeks, Bailey "left as a happy, outgoing bouncy kid, and she came back lethargic and scared and just different." That August, Kelly was giving Bailey a shower after a visitation and when the water hit Bailey's legs, she started crying, Kelly discovered a "razor burn or whisker burn on [Bailey's] inside thighs -- her inner thighs and her genital area looked like it

had been scrub brushed." Kelly took Bailey to the emergency room and told them her daughter had been abused, and a "SANE rape kit" was done. According to Kelly, during a CAC interview the next day, Bailey said "'my Daddy touches my body,'" and Kelly said that at that time, Bailey referred to her genital area as her body.

After the SANE kit at the emergency room, Kelly began taking photographs of Bailey before and after visits with Eric. "The nurse that did the . . . SANE report told me that that's what they advised parents to do when there's abuse" and "to take pictures of her pre and post visit so that she can see clearly there was no injuries, no bruises, no abrasions prior to her leaving but two days later there's clearly bruises and abrasions and issues." Kelly denied that Bailey was traumatized by the photographs, and said that she would not have taken photographs if she thought she was traumatizing Bailey. According to Kelly, the same nurse recommended taking Bailey to the doctor before and after the visits. (Kelly did not call the nurse as a witness at trial.) Kelly continued with the photographs and doctor appointments from September 2012 until about February 2013, "and at that point I told Dr. Brosz, I was done, I wasn't going to do this any more." "[N]obody was paying attention, nobody was listening to me." "Nobody was paying attention to the swollen cheek and the black eye and the giant rug burn on her back and all the things she was saying, the fact that she was losing three pounds every visitation. Nobody was listening to that. I wasn't going to put her through it any more." Dr. Brosz said that was fine and that was Kelly's decision.

As for the vaginal swabs, Kelly said that "Dr. Haake at the Grand Island Clinic showed me how to do it because they were having trouble collecting any kind of sample when [Bailey] had . . . vaginal infections, there just wasn't enough present." "[S]he even sent me home with the [three or four] test kits so it would be a clean collection I guess and wouldn't have any foreign stuff in it." The swabs were to be done "[o]nly if I saw discharge." (Kelly did not call Dr. Haake as a witness at trial.)

When asked if she knew which medical personnel made reports to DHHS, Kelly responded, "I know Dr. Brosz made two calls against Eric, and I know there was a nurse -- I believe it was a nurse at Grand Island Clinic that also made a call against Eric," "[b]ecause there was clearly abuse." However, Kelly acknowledged that the only investigation that came back as founded was the one against Kelly. On cross-examination, Kelly stated that Dr. Brosz "filed these [Child Protective Services'] complaints" against her which led to her being in juvenile court.

Since the juvenile case with Bailey, Kelly is not "able to address [concerns of possible sexual abuse] in any way." "I listen to what [Bailey] has to say, and I am empathetic with her. I don't want her to feel like I'm not listening or I don't hear what she is saying, but there are no avenues for me to take to address those concerns." Kelly stated, "[The child abuse hotline] told me on the phone they will not accept any new intakes on Bailey from me." When asked if she ever told Bailey that she believed Eric was sexually abusing her, Kelly responded, "No," "I have never talked to her about that."

Kelly still has concerns about Bailey's behaviors after visits. Bailey is "very upset," "[s]he has low self-esteem," "[s]he frequently has bruises that don't seem like normal childhood bruises," "[s]he has nightmares," and "[s]he struggles with going to school" because she is tired.

Eric learned from DHHS that Kelly was taking photographs of Bailey before and after his parenting time. Eric testified that after the investigations of him started, Bailey's behaviors

changed. "She shyed [sic] away from taking pictures." "If she knew you were taking a photo of her, she would hide her face." "She would hide behind somebody or she just [sic] run away." Also after the investigations started, Bailey did not want to go to the doctor; when Eric told her they had to take her to the doctor for a spider bite, Bailey "literally screamed" because she did not want to go.

Eric also testified that the investigations impacted his relationship with Bailey. Bailey became "timid" and "wasn't the same girl." And Eric's interactions with Bailey changed because he did not want there to be any suggestion that he was sexually abusing Bailey. Eric relied on his current wife, Jessica Manka, to help care for Bailey. "I didn't take care of [Bailey]. I mean, Jessica was pretty much the one that took care of her [and gave her baths]. I didn't ever, ever stay home alone with her. We didn't do anything just the two of us. There was always somebody there." Eric and Jessica also made sure that Eric's teenage son from a prior relationship was not left alone with Bailey. At the time of trial, Eric had a "good relationship" with Bailey, and he did not worry about being alone with her anymore.

Jessica described Bailey and Eric's relationship as a "normal daughter/daddy . . . relationship." Jessica had never observed Bailey demonstrate any kind of discomfort or fear around Eric. And Jessica had never seen Eric abuse Bailey in any way. Jessica stated she and Eric had been investigated by DHHS and law enforcement "[m]ore than five" times due to allegations of child neglect, uncleanliness, and that the house was unfit for Bailey to be in. The allegations of sexual abuse turned their house "upside down." Eric and Jessica changed routines (like bathing) and "felt like [they] had to walk on egg shells." Bailey became "a little more clingy to [Eric] than what we were used to seeing, whiny, come [sic] to the point where she would cry when she didn't want to go home." Jessica would be concerned about Bailey's relationship with Eric if Bailey continued to stay with Kelly. "I worry about the alienation that happens, him not being able to be that hands-on parent that he wants to be." However, Jessica would still support Bailey having a relationship with Kelly.

Jessica's daughter (21 years old at the time of trial) lived in Jessica and Eric's home from 2012 to 2015, and during that time had the opportunity to observe Eric and Bailey together; she described Bailey as "very much a daddy's girl" and said Bailey and Eric had a "very good" relationship. Jessica's daughter said she did not observe Eric or Bailey act inappropriately around each other, and she never observed Bailey to display fear or discomfort around Eric. However, when it was time for Bailey to return to Kelly, Bailey was "agitated" and "didn't want to go," "[s]ometimes she would cry."

A friend of Eric and Jessica's testified that she observed Eric and Bailey together "[s]everal times" and that Eric and Bailey appeared bonded, and Bailey was "very attached" to Eric; Bailey never appeared frightened of him. The friend also never had any concerns about her own daughters' safety when Eric babysat them.

Kelly's ex-husband (married to Kelly from 1995 to 2008) testified that he never had any concerns about the safety of his three children (two boys and one girl) being around Eric when Eric and Kelly were married.

Kelly's current husband (married in October 2016) described Kelly and Bailey's relationship as "[v]ery good and loving." He had not observed anything being said or done by Kelly to try to alienate Bailey from Eric. And during her testimony, Kelly denied that she would

try to alienate Bailey from Eric. Kelly was just concerned about Bailey's safety. Kelly did not believe that Bailey has been sexually abused "recently," and she thought the reason was because this case was pending. Kelly believed that Eric should have supervised visitation, and that it would be in Bailey's best interests if Eric's parental rights were terminated.

Beyond the sexual abuse allegations, the parties also testified about their communication difficulties. Eric and Kelly each testified that the other would not inform them of Bailey's extracurricular activities and medical appointments. When asked to describe his communication with Kelly, Eric responded, "There is none." "It hasn't gotten better, but . . . we can e-mail or we can text a little bit more than we have for the last seven years. But there's still no . . . communication as to what goes on with Bailey, medical, personal, nothing." However, during her testimony, Kelly testified that she always communicated with Eric and kept him advised of what was going on, but claimed that he did not do the same. Despite Kelly's testimony that she kept Eric advised of what was going on, she did not tell Eric that she and Bailey were temporarily living in a hotel (their home was undergoing repairs for damage caused by a main sewer collapse) because she "didn't think it was relevant," "[i]t's not a permanent home." At the time of the hearing, they had already been at the hotel for 1½ to 2 weeks, and did not know how much longer the home repairs would take. Kelly still had Eric do pick ups and drop offs at her house because "we are there most of the time unless we're at work or school." Additionally, on-cross examination, Kelly acknowledged that she did not tell Eric that she was putting Bailey on "ADHD" medication, nor did she consult with Eric prior to making that decision. Kelly stated that Bailey had been on ADHD medication for "2 weeks" and was doing well.

Kimberly Otte Kriha is a licensed independent mental health practitioner and has worked with Bailey since May 2016. In their sessions, they address Bailey's anxiety and attention deficit disorder issues. Over the course of counseling, Otte Kriha recommended that Kelly "be consistent and maintain a lot of structure." Having the same routine is important for Bailey. "I haven't had a lot of recommendations for her because I feel like she does a really good job addressing Bailey's issues." And Otte Kriha believed that Kelly was able to provide the emotional and psychological support needed by Bailey.

Otte Kriha stated that Eric brought Bailey to a couple sessions during her extended stays over the summer. The first time he brought her in, they talked about what Otte Kriha was doing with Bailey, and he expressed some concerns about Kelly. But Otte Kriha felt that Kelly was a "very good parent," and "tried to reassure Eric that [she] didn't have concerns." Otte Kriha told him that if he had questions he was always welcome to call or come in, the "door's always open to parents." Eric testified that he only met Otte Kriha once for about 15 minutes and asked her what she was seeing Bailey for; when Otte Kriha said anxiety, Eric "could see it," because "after the rape kits, after the gynecological exams, and all that stuff, [Bailey] probably [was] anxious." Eric said Otte Kriha did not discuss any other concerns regarding Bailey, had never visited Eric's home, and never set any followup appointments with him.

When asked to give an opinion about whether it was in Bailey's best interests to stay in Kelly's custody, Otte Kriha responded, "I feel like it's best for Bailey for things to remain as they are for the sake of consistency for her." When asked if she had an opinion about whether Eric should have more parenting time, Otte Kriha again responded, "I feel like things should remain as they are for the sake of consistency for her."

On cross-examination, Otte Kriha acknowledged that she was not treating Bailey for trauma and that Bailey had not made any disclosure to her about any kind of trauma. Nor had Kelly mentioned any statements or claims Bailey may have made. Otte Kriha was aware of allegations of sexual abuse in Bailey's past, but had not seen anything from Bailey that indicated consistency with those reports.

Eric denied that he had ever sexually or physically abused Bailey. And he had concerns about Bailey being in Kelly's care because "of all the stuff that has gone on and the simple fact that [Kelly] still implies that she believes that still goes on today." "[T]he more [Bailey] gets bombarded with this, the more there is a chance that she's going to start believing something of it." Eric also had concerns about Kelly having sole discretion with regard to Bailey's medical care because in the 2 years following the divorce, Bailey went to the doctor 117 times; and at one point, there were two of the same prescriptions from two different doctors and there was a total of 18 refills between the two. Eric asked the district court to modify legal custody and to at least give him an equal say in Bailey's care. Eric also asked the court to award him physical custody of Bailey. Eric believed it was in Bailey's best interests to be in his care because Bailey needed a parent who was willing to be open and communicate. Eric believed he was capable of working with Kelly to meet Bailey's needs, but did not feel that was reciprocated. Eric was willing to foster a loving relationship between Bailey and Kelly because "[Bailey] still needs her mom."

### 3. DISTRICT COURT'S ORDER

In its order filed on October 25, 2018, the district court found that Eric met his burden of proving a material change in circumstances, noting Kelly's failure to communicate with Eric and her disregard for Eric's relationship with Bailey. The court found Kelly's actions and continued attitude posed a threat to Bailey's relationship with Eric and that a change in primary custody was in Bailey's best interests. However, the court adopted "the Alternative Parenting plan" proposed by Eric as it "would be a less drastic change yet allow [Eric] to continue to develop a relationship with Bailey." The Alternative Parenting Plan attached to the order and adopted by the court provides for the "joint legal and physical custody of Bailey," wherein Eric and Kelly "alternate parenting time on a weekly rotation basis," with the parenting time change beginning on Fridays when Bailey is released from school. A holiday and summer parenting time schedule were also established. As noted by the district court, "The Alternative Parenting plan also provides [Eric] with the final decision making [regarding Bailey's education, religious upbringing, and medical needs] which should reduce the risk of unnecessary examinations." The district court found that neither party was ordered to pay child support, as pursuant to a joint custody calculation, the parties' obligations nearly offset each other.

Kelly filed a motion for new trial. In an order filed on January 31, 2019, the district court overruled the motion, except that it stayed the modification of custody until June 1, 2019 (following the completion of Bailey's school year), and it ordered that Eric's child support obligation based upon the joint custody calculation was $409 per month.

Kelly now appeals.

### III. ASSIGNMENTS OF ERROR

Kelly assigns, consolidated, that the district court erred in (1) finding that Eric had shown a material change in circumstances, (2) finding that it was in Bailey's best interests to be in the joint legal and physical custody of both parties, (3) failing to give greater weight to the opinion of the "expert witness," and (4) granting Eric final decisionmaking authority.

### IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

### V. ANALYSIS

Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Id*. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*.

#### 1. MATERIAL CHANGE IN CIRCUMSTANCES

A material change of circumstances constituting grounds for modification of a dissolution decree means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Eric H. v. Ashley H., supra*. The party seeking modification of a custody order must prove a material change of circumstances by a preponderance of the evidence. *Id*.

In its order granting the modification of custody, the district court noted that in the original divorce decree, Kelly was informed that her responsibilities to cooperate and communicate with Eric regarding Bailey could not be overemphasized. However, the evidence at the modification trial revealed that, following the decree, Kelly did not cooperate or communicate with Eric. The court stated,

> [Kelly] has demonstrated a disregard for [Eric's] relationship with his child. [Kelly's] actions were significant enough to warrant intervention in a juvenile action. While the juvenile court ultimately terminated jurisdiction as [Kelly] presented no immediate safety concern, those actions still represent a change in circumstances. [Kelly's] continued actions, including not informing [Eric] of the child's temporary residence and

regarding putting the child on ADHD medication demonstrate an ongoing pattern of behavior.

The court found that "[h]ad the trial court known that it's [sic] directive [to cooperate and communicate] would be unheeded, the trial court would have been persuaded to rule differently." Accordingly, the court found that Eric met his burden of proving a material change in circumstances.

We agree with the district court's determination that Eric proved a material change in circumstances since the entry of the decree. Not only does the record reveal that Kelly failed to communicate with Eric, specifically with regard to Bailey's temporary residence and ADHD medication as noted by the district court, but it also reveals Kelly's ongoing assertions that Eric was abusing Bailey. And despite her repeated claims not being substantiated, she continued to believe that the abuse was occurring. Kelly's behaviors and actions since the decree were adversely impacting Bailey's relationship with her father, as well as Bailey's own behaviors. Kelly's conduct since the decree constitutes a material change in circumstances affecting Bailey's best interests.

### 2. BEST INTERESTS

A court may order joint custody "if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent." Neb. Rev. Stat. § 42-364(3)(b) (Reissue 2016). In determining custody, § 43-2923 states, in pertinent part:

(6) In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . . and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

In considering the best interests factors, the district court found that both parents had a close and loving relationship with Bailey, and that Bailey had been involved in therapy for anxiety and "ADD" issues. Bailey did not testify or state a preference in the custody matter, however, the court noted,

[M]ost significant to the court is the effect on the child as to the result of continuing or disrupting an existing relationship. [Kelly's] actions are likely to disrupt the relationship between father and daughter. Despite Law enforcement and social service findings to the contrary, [Kelly] continues to insist that the child is not safe and that [Eric] has sexually assaulted the child. While DHHS determined that [Kelly] no longer presents an immediate safety concern the Court believes that [Kelly's] actions and continued attitude poses a very real threat to the relationship between Bailey and her father.

The court concluded that a change in primary custody was in Bailey's best interests. Based on our review of the record, we find no abuse of discretion.

Eric and Jessica both testified as to how Eric's relationship with Bailey was affected by Kelly's actions. He had to alter his day-to-day interactions with Bailey for fear of having another accusation made against him. Eric and Jessica both testified that Bailey herself was affected; she no longer wanted to be in photographs, had a fear of doctors, she became "timid" and "wasn't the same girl." Despite all of Kelly's claims against Eric being unsubstantiated, she continued to believe that Eric abused Bailey and thought it was in Bailey's best interest for Eric to have supervised visits and to have his parental rights terminated. The district court believed that Kelly's actions and continued attitude posed a very real threat to the relationship between Bailey and her father, and thus a change of primary custody was warranted. Based upon our review of the record, we cannot say the district court abused its discretion in reaching that decision.

Kelly argues that the district court should have given greater weight to the opinion of Otte Kriha, "the expert witness in the trial" who recommended that custody and parenting time remain the same. Brief for appellant at 3. However, as noted by Eric, Otte Kriha "was not offered or accepted as an expert." Brief for appellee at 14. Furthermore, the trial court had "ample evidence (from Ms. Wilson and many other witnesses including two law enforcement officers) to weigh against the opinion of . . . Otte Kriha." *Id*. at 16. The district court specifically stated that it had to balance the risk of Bailey's relationship with Eric against Otte Kriha's recommendation of consistency, and found that "the risk to the child's relationship with her father outweighs the risks of a change in primary custody and are likely to be longer-lasting." In fact, it is clear that the court considered Otte Kriha's recommendation, as well as the effect on Bailey as a result of disrupting an existing relationship with Kelly because, even though Eric asked the court to award him physical custody of Bailey, the court adopted "the Alternative Parenting plan" proposed by Eric (alternate parenting time on a weekly rotation basis) as it "would be a less drastic change yet allow [Eric] to continue to develop a relationship with Bailey." The parent-child relationship is of critical importance in the welfare and development of the child and the relationship between the child and each parent should be equally considered unless it is contrary to the best interests of the child. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019).

Finally, the parties' communication difficulties do not prevent an award of joint legal custody. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016). We find no abuse of discretion in the district court's award of joint legal custody.

### 3. Final Decisionmaking Authority

In considering best interests, it is a common occurrence and a court is permitted to supply a party with final decisionmaking authority in some areas to avoid future impasses which could negatively affect the child while maintaining both parents' rights to consultation and participation in important decisions. *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). The district court adopted Eric's Alternative Parenting Plan and stated, "The Alternative Parenting plan provides [Eric] with the final decision making [regarding Bailey's education, religious upbringing, and medical needs] which should reduce the risk of unnecessary examinations." We conclude that the court's reasoning for awarding Eric final decisionmaking authority was reasonable and we find no abuse of discretion.

## VI. CONCLUSION

The district court's order modifying custody of the parties' minor child is affirmed.

AFFIRMED.