IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PARRISH V. PARRISH

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

GREGORY A. PARRISH, APPELLEE AND CROSS-APPELLANT,

V.

ANGELICA Y. PARRISH, APPELLANT AND CROSS-APPELLEE.

Filed April 11, 2023.    No. A-22-362.

Appeal from the District Court for Lancaster County: KEVIN R. MCMANAMAN, Judge. Affirmed.

David P. Kyker for appellant.

Steffanie J. Garner Kotik, of Kotik & McClure Law, for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Angelica Y. Parrish appeals the order of the Lancaster County District Court that dissolved her marriage to Gregory A. Parrish and awarded the parties joint legal and physical custody of their three children, with Gregory having final say if the parties could not agree on the children's "religious upbringing, schooling, and medical needs." Angelica contends she should have been awarded sole legal and physical custody of the children, as well as given final say as to issues involving the children. On cross-appeal, Gregory contends that he should have been awarded sole legal and physical custody of the children and that the court erred in ordering him to pay child support. Finding no abuse of discretion, we affirm.

- 1 -

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

Gregory and Angelica married on July 4, 2009; they have 3 children together: Jami, born in 2008, Ryan, born in 2010, and Max, born in 2013. Both Gregory and Angelica subsequently each had a child during separate relationships.

On March 25, 2019, Gregory filed a "Complaint for Legal Separation" against Angelica, indicating that the parties had moved from Oklahoma to Nebraska in June 2018, and requesting that the district court award him the "legal and physical care, custody, and control of the minor children." He further requested an equitable division of the personal property and debts of the parties, and for Angelica to be ordered to pay child support.

Gregory simultaneously filed a "Motion for Ex Parte [sic]," requesting that the district court appoint Gregory as temporary guardian of the children "due to an emergency situation," which he described in an attached affidavit. In the affidavit, Gregory claimed that Angelica had been committed to a mental health facility "due to her erratic behavior." He stated that she had "been repeatedly calling the police and going to the hospital for treatments." He stated that on March 22, 2019, Angelica "was taken to the hospital by a worker from Health and Human Services who was investigating our children's welfare. She then was refusing treatment and continued to be erratic so she was admitted to" a mental health facility. He further averred that Angelica had falsely reported him to the police for sexually assaulting the children and had taken the children to the "home of an individual [he] did not know" which was "unsanitary," and had informed him that "Health and Human Services" was going to take custody of the children. Gregory was permitted to pick up the children, but he was afraid Angelica would "pick up the children" after her discharge from the hospital and that he did "not know where she may go with them." On March 26, following a hearing on the motion, the court entered an order granting Gregory "temporary guardianship" of the children.

On April 9, 2019, Angelica filed an "Answer and Counter-Complaint for Dissolution of Marriage," wherein she denied each allegation of Gregory's complaint. In her "Counter-Complaint," Angelica sought legal and physical custody of the children, child support, spousal support, a division of the parties' property and debts, and attorney fees.

Following a hearing, the district court entered a temporary order on May 1, 2019, granting the parties joint legal and physical custody of the children. It further ordered that the children reside with Angelica until Gregory "secured a residence," at which point the parties would have parenting time "on an alternating week basis." The court further ordered Angelica to not allow the children to have contact with "Emanuel Stanton," and it enjoined the parties from going into the other party's home unless "expressly invited."

After various motions were filed by both parties regarding the temporary order, the district court entered another temporary order on May 12, 2020, which, among other things, continued the joint legal and physical custody arrangement and required Gregory to pay $175 per month in child support.

## 2. TRIAL

Trial was held on October 5 and November 23, 2021, and January 31, 2022. Gregory, Angelica, two law enforcement officers, Dan Nguyen (Angelica's boyfriend), and Diane Wagner (the children's therapist), testified, and numerous exhibits were received into evidence. The evidence relevant to the issues on appeal follows.

### (a) Domestic and Child Abuse Allegations

Angelica testified that Gregory was emotionally abusive throughout the course of their marriage. She testified that he would "break [her] things," "punch holes in the wall," "call[] [her] names in front of [their] children" such as "[b]itch, whore, slut," and isolate her from her friends and family. She further stated that "[e]very aspect of [her] life [was] controlled" by him and "it felt like [she had] no voice because every time [she'd] ask for help," he would "say [she's] crazy" and threaten to "take the kids."

Gregory denied that he ever abused Angelica. He testified that he had never been charged with assault, nor had he ever been contacted by law enforcement to be interviewed regarding an assault or domestic assault.

Angelica described numerous incidents of abuse and her attempts to obtain assistance from law enforcement, services for those experiencing domestic abuse, as well as protection orders against Gregory. In 2016, while living in Oklahoma, she sought assistance from "DVIS" and obtained a protection order against Gregory because she believed he was poisoning her. Gregory stated that Angelica "dropped" the protection order once "her test results came back that [he] wasn't poisoning her." In January 2016, Angelica came to Nebraska with the children and obtained a protection order against Gregory. A week later, she returned to Oklahoma and "dropped" the protection order again. According to Gregory, she was "taken to detox" during her time in Nebraska.

According to Angelica, she informed Gregory in 2017 that she was going to leave him. Gregory threatened that he would take his life if she left him. Angelica stated that Gregory then went to a mental health facility and was diagnosed with "bipolar disorder and anger management issues." Gregory denied ever receiving these diagnoses.

In June 2018, Angelica, Gregory, and the children moved from Oklahoma to Nebraska, where they lived with Angelica's father. Angelica testified that in 2019, she began seeing a therapist and was receiving treatment for "PTSD from abuse and trauma." She stated that she was seeing the therapist every 2 months at the time of trial.

Angelica claimed that on March 16 or 17, 2019, while they were in Oklahoma for a funeral, Gregory sexually assaulted her. She stated they "weren't technically romantically together" at the time and were staying in separate rooms at a hotel. While she was in the shower, Gregory came into the bathroom and attempted to engage in sexual activity with her. She testified that she resisted and "[h]e bit [her] on [her] vagina."

On March 19, 2019, after the parties had returned to Nebraska, Angelica called law enforcement and reported that Gregory was sexually assaulting the children and was abusing her. Gregory testified that on the way back from the funeral in Oklahoma, Angelica "started smoking or vaping marijuana" and "got really upset that night." Gregory "was to the point [he] was over it" and "wanted to go." He said he was leaving for "Oklahoma tomorrow," so "the kids were upset

and they wanted to stay in [his] room with [him]." Gregory then woke up in the middle of the night because Angelica was crying outside the room and then the police showed up. At the conclusion of the investigation into Angelica's allegations, no charges were brought against Gregory. However, according to Gregory, Angelica was taken to detox when law enforcement arrived.

Angelica testified that on March 21, 2019, Gregory "tried to fight [her] father in [their] living room." After Gregory "got in [her] father's face," she called law enforcement and took her children to the home of her friend, Emmanuel Stanton; she and the children stayed the night there. The children were absent from school the following day "[b]ecause of everything that had gone on the night prior." According to Gregory, the school resource officer called him and inquired about the children's absence. Gregory informed the resource officer that he believed Angelica had taken the children to Stanton's home. Later that day, Angelica called Gregory and notified him that "Health & Human Services" were at Stanton's home and informed her that "if [she did not] bring [the children] back to [her] house[,] . . . they were going to take custody" of the children. Gregory picked up the children and Angelica went to a mental health facility with a "DHHS worker." Angelica testified that she voluntarily admitted herself because she "felt like they weren't understanding the situation. And [she] felt that was [her] only way to show them that this [wasn't her] having a mental breakdown[,]" rather it was "abuse." When asked whether she believed she "needed mental help" at the time, she responded, "Absolutely not. Maybe with PTSD from suffering abuse from Gregory."

Following the incident, an order was entered forbidding Angelica from taking the children to Stanton's home. At this point, she learned that Stanton had a criminal history. Angelica continued to visit Stanton but did not bring the children with her.

Angelica claimed that on April 14, 2019, she was trying to take a car to go to the pharmacy to pick up a medication, but Gregory had placed a "wheellock" on the steering wheel of the vehicle. Gregory explained that Angelica "was leaving to go to Stanton's house nightly and taking [the] car with the children's car seats." Gregory described an incident where he "needed to take the kids somewhere" but Angelica refused to return the vehicle with the car seats. Gregory then "put the steering wheellock" on the vehicle with the car seats to stop her from taking that vehicle. He stated that they had another functioning vehicle available for her to use, which did not have a wheellock. Gregory claimed that Angelica "got upset and as [he] was getting the kids in the house, she came behind [him] and kicked [him]" with her medical boot, leaving "the whole mark of [her] boot on the back of [his] leg." Angelica explained that she did not intend to kick Gregory, but that "he stopped in front of [her]" and her "boot hit the back of his leg." Gregory called law enforcement following the incident and Angelica was ticketed.

According to Angelica, on November 22, 2019, while walking Max "to the car at the end of [her] cul-de-sac," she "noticed that [Gregory] had brand new clothes on . . . and [she] asked [Gregory] why [the] kids still had clothes that didn't fit or shoes that were torn." She testified that Gregory then "berated [her] in front of the kids." Angelica claims that while she was getting the children in Gregory's car, Gregory "pushed [her] and [she] fell back." He was then "on top of [her] on the ground." She stated that she "hit the ground three times" and was taken to a hospital because she had lacerations on her knee and elbow. She testified that she continues to suffer from "[p]ost-concussion syndrome" and "thoracic outlet syndrome" as a result of the incident.

Gregory contested Angelica's version of events. He claimed that he dropped the children off to be with Angelica, but shortly after, they called him and were "screaming" for Gregory to pick them up. He initially declined to, but Angelica then got on the phone and questioned why he would not pick up the children and whether he "had a date." He claimed that Angelica "kept going on and on about [how] he doesn't love [the children]" while the children were present. Gregory stated that he then turned around to pick up the children, and "the whole way back" she was "berat[ing]" him over the phone. He stated that while he was putting the children in the car, Angelica came out, and was "verbally still going." She was trying to come to the front of the car, so he blocked her from getting in the driver's seat. Then while he was getting Max in the car, she repeatedly punched Gregory in the face. He then "took [Angelica] down straight back onto her back." He stated that she continued punching him, so he picked her up and again threw her onto her back. Then Gregory called law enforcement. Angelica testified that she was charged with domestic assault and child abuse. Angelica completed diversion for the charges by taking domestic violence classes, completing community service, and paying a fine. As a result, the charges were dismissed.

Wagner, the children's therapist, testified that Jami had expressed that she was upset because she "had not been truthful with law enforcement because she was afraid of what [Gregory] would do." When asked whether it "would be accurate to say that all three children had indicated in therapy at some point" that while they initially reported that "[Angelica] was the aggressor," they later indicated that "it was [Gregory]," Wagner responded, "Yes, they did do that." Specifically, Max informed Wagner that he had seen Gregory "smash [Angelica] up and down on the ground."

Angelica testified that, since March 2019, she called law enforcement to report abuse by Gregory "[a]t least five or more times." Two of the reports included allegations of sexual abuse of the children which resulted in interviews at the Child Advocacy Center. None of the reports resulted in charges against Gregory.

During a therapy session in 2020, Jami stated that she was "upset that she was being left alone with [Gregory's] girlfriend's son" and "with having to be responsible for the other two Parrish children." Wagner stated that Jami's concern was that Gregory's girlfriend's son "has some physical and cognitive deficits, and [Jami] didn't feel like she could control the situation." Wagner stated that based on what Jami told her, she believed the child had "a tube that he's fed through" and is "not verbal." Jami was 11 years old at the time. Wagner "called CPS" because she is a "mandatory reporter" and she believed that it was "not appropriate for somebody with that level of care to be left with a person that young."

Gregory testified that he had left the children alone with Jami on various occasions while he was at work "four minutes" away, but only for a few hours at a time. Jami and Ryan each had a cellphone so they could contact him if necessary. Gregory explained that although his girlfriend's 12-year-old son had autism and "HCP," he was "fully functional" and verbal, and was capable of taking care of his "own needs," such as using the restroom. Gregory also stated that his girlfriend's son has not been fed with a feeding tube since he and his mother moved in with Gregory.

At the conclusion of law enforcement's investigation into Wagner's report, her allegations were determined to be unfounded.

### (b) Communication

Angelica testified that it is difficult for her to communicate with Gregory. When asked about her understanding of what co-parenting entails, Angelica responded that "it's communication but this is a volatile, abusive situation, so there is no communication." Then, when asked whether she is "able to put differences aside to communicate with [Gregory]," she stated that she "cannot communicate with [her] abuser, no."

Angelica did not inform Gregory of certain health related decisions she made for the children. For example, in March 2019, Angelica set up an appointment with a therapist for herself and the children and she did not inform Gregory of the appointment ahead of time. She explained that she did not inform him because he previously "prevented [the children] from going to therapy." However, Gregory "showed up to [the] appointment and basically disrupted [it]." The therapist later informed Angelica that she could not "help [them] because of the volatile situation. She preferred [that Angelica] . . . find someone else."

At "the end of . . . 2019," the children began seeing Wagner for therapy. Angelica testified that Gregory knew "[t]he whole time" that she was setting up an appointment for the children to see Wagner. However, she did not speak with Gregory to determine "[i]f he would approve of [Wagner]." Gregory testified that Angelica did not seek his input regarding the children seeing Wagner. He believed the children should see a therapist, but he "wanted to make sure that whatever therapist they had[,] it was for them, and not for us."

According to Angelica, in "July or August" 2020, she changed the children's doctor and dentist without discussing the changes with Gregory ahead of time. When asked whether she believed this was "something that [Gregory] should have had a say in based on the fact that [he and Angelica] share[] joint custody," Angelica responded, "No." When asked to provide her reasoning, Angelica said, "[b]ecause of our past and the abuse."

Gregory described various instances where the children stayed home from school and Angelica did not notify him. For example, Jami was ill in September 2021 and stayed home from school. The following day, all three children were ill and stayed home from school. Angelica did not inform Gregory of their absences until after he inquired about them.

According to Gregory, if the district court ordered continued joint custody, he would notify Angelica of important matters involving the children, including "doctors' appointments," "dental appointments," and "[a]nything that has to do with the school." He stated that he had communicated with her about these things throughout the pendency of the divorce case. However, Angelica stated that there were instances where Gregory did not notify her of certain health-related decisions he made for the children. For example, she stated that Gregory allowed Jami to be vaccinated "[f]or the HPV virus" without consulting with her. Gregory admitted that there were doctors' appointments that he could have reached out to Angelica about.

Angelica and Gregory now use "Talking Parents," a software application which allows them to discuss matters related to the children by text messaging.

### (c) Children's Therapy

Wagner testified that she had been the children's therapist since the beginning of 2020, and she had seen the children "[a]round 30" times. She had diagnosed each of the children with an

"adjustment disorder." Wagner described her role as assisting the children "process" and "cope" with their life circumstances.

Wagner stated that Gregory was initially willing to cooperate with the children's therapeutic process, but he later stopped bringing them to therapy during his parenting time. Wagner stated that Gregory described the children's therapy as a "bash on dad session." The children frequently indicated to Wagner that Gregory "told them that they were not allowed to talk about what happened in his home." Wagner stated that this was "concern[ing]," but that she did not believe Gregory "would do anything in his house that would endanger his children," rather, she believed he was trying to "control what goes on there."

According to Wagner, the children had difficulty adjusting to their shifting familial arrangements. For example, Ryan expressed to Wagner that he was upset that Angelica was having a child with a different man while she was still married to Gregory. Jami too expressed that she was upset when her mother had another child. Jami was also frustrated with the number of people living in Gregory's apartment. She did not like that it was "crowded" and that various toys were thrown away and pieces of furniture "that she felt [were] part of her home" were "being replaced." Wagner indicated that difficulty adjusting to changing familial circumstances was common among young children.

Wagner further testified that she believed the children were feeling "torn loyalty" as a result of their parents' divorce. For example, Jami "was feeling pressured repeatedly . . . by [Gregory] to testify in court that she wanted to live with him. And that pressure has consistently caused her stress." Jami expressed to Wagner on numerous occasions that she did not want to testify. Ryan also informed Wagner that Gregory "wanted him to testify in court and had . . . a narrative for him to use in court."

Ryan informed Wagner that when the children spoke on the phone with Angelica, "either [Gregory] or [his girlfriend] had to be listening in and it had to be on speaker phone." The children also informed Wagner that Gregory "grilled" them about "everything they had done" during their mother's parenting time following each visit with her. Wagner stated that the children "are afraid of what will happen if they disclose anything that makes [Angelica's] house look fun or favorable." The children did not inform Wagner that Angelica similarly "grilled" them after their visits with Gregory.

The children also informed Wagner that Gregory made negative comments about Angelica on numerous occasions. For example, the children indicated that Gregory "says [Angelica is] lazy" and has called her "a piece of poop." The children did not express to Wagner that Angelica spoke negatively about Gregory in their presence.

Wagner testified that the children loved both of their parents and she did not "have grievous concerns about [Gregory and Angelica] parenting their children." She also testified that she ultimately believes both Gregory and Angelica should have parenting time with the children.

(d) Parenting Time

Gregory requested that the district court provide him with a "credit" of $3,008.15, the amount he paid in child support throughout the course of the case, because he "had the kids a lot more." Gregory had the children for a month when he obtained "temporary guardianship" of the children in March 2019. Gregory left Angelica's father's house in April and moved to a homeless

shelter. The district court then entered an order requiring that the children remain with Angelica until Gregory found his own home. However, Angelica returned the children to Gregory while he was still in the homeless shelter. Angelica claimed that the children "were being very out of control" and that they were only at the homeless shelter with Gregory for one night because Gregory moved into his own apartment "the following day or that weekend." Gregory claimed that he and the children were in the homeless shelter from "April 20th or so until May 10th." Once Gregory moved into his own apartment, he and Angelica had temporary joint physical custody, with their parenting time alternating on a "week on week off" basis. Gregory stated that Angelica then had her baby and the children stayed with him for another "few weeks."

Angelica testified that she tested positive for COVID in December 2020, and she requested that Gregory keep the children with him to keep them from getting sick. Gregory testified that the children remained with him for "almost all of December." Angelica's father passed away from complications related to COVID in February 2021. Angelica stated that Gregory kept the children for "a couple of extra days."

### (e) Living Arrangements

In 2020, Angelica had a child with her boyfriend, Dan Nguyen. Nguyen and their child live together in Angelica's father's house, along with the parties' three children. Angelica testified that she is in the process of purchasing her father's house. She described the house as a two-story home with three bedrooms "on top" and a room downstairs, as well as a "huge yard for [her] kids to play in." She stated that it is located on a "cul-de-sac[,] so it's pretty safe." Nguyen testified that although Angelica "gets a little flustered" at times with the children, she is loving towards them and "tries to teach them life lessons like doing chores." He stated that she helps them with their schoolwork and provides them with structure.

Gregory testified that he lived in a three-bedroom apartment with the children, his girlfriend, their new baby, and his girlfriend's son. Ryan and Max initially shared a room with Gregory's girlfriend's son; Jami had her own room. Gregory testified that during COVID, he and his girlfriend moved her son, who has various health conditions, to the master bedroom as a precautionary measure. Gregory, his girlfriend, and the baby moved into the living room.

### (f) Parties' Employment

Angelica testified that she had previously worked various "minimum wage type jobs" but had not been employed since 2019 due to various health issues, including endometriosis and related complications. She stated that her condition "makes it difficult for [her] to remain on a schedule with employers because [she] has symptoms that arrive at any moment." She further testified that she has had three surgeries since spring of 2019. She was also in physical therapy due to "the injuries from the assault." She testified that, due to her various medical conditions, she is not able to obtain employment.

Gregory testified that Angelica previously earned "ten, twelve dollars an hour" working at a liquor store in Oklahoma. He asked the district court to calculate child support based on her earning capacity of $10 or $12 an hour. Gregory had been employed with "Kamterter Products" since 2018, earning an annual salary of $46,000.

### 3. DECREE OF DISSOLUTION AND AMENDED DECREE

On February 15, 2022, the district court issued a decree dissolving the parties' marriage. The court found both parties to be fit and proper persons to have legal and physical custody of the children and that it was in the children's best interests to be placed jointly in their custody. The court gave Gregory final say in the event the parties could not agree regarding legal decisions for the children. Gregory was ordered to pay $99 per month in child support for the 3 children.

On February 18, 2022, Angelica filed a "Motion to Alter or Amend," and on April 13, 2022, the district court entered an "Amended Decree of Dissolution of Marriage," which according to a later order entered by the court, disposed of Angelica's motion. Under the amended decree, Gregory was ordered to pay $197 per month in child support for the parties' three children.

Angelica appeals and Gregory cross-appeals.

## III. ASSIGNMENTS OF ERROR

Angelica assigns that the district court erred in (1) awarding the parties joint legal and physical custody of the children and (2) awarding Gregory final say in the event of an impasse when making child-related decisions.

On cross-appeal, Gregory assigns that the district court erred in (1) ordering him to pay child support to Angelica and (2) not awarding him sole legal and physical custody of the children.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id*.

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

## V. ANALYSIS

### 1. JOINT CUSTODY

Angelica on appeal and Gregory on cross-appeal each assign that the district court erred in granting them joint legal and physical custody of the children; each contends that she or he should have been granted sole legal and physical custody. Given that the parties shared joint legal and physical custody for almost 3 years since the entry of the temporary order in May 2019, and considering that there was favorable and unfavorable evidence about both parties, we cannot say the district court abused its discretion by maintaining the joint legal and physical custody arrangement initially ordered in May 2019.

When deciding custody issues, the court's paramount concern is the child's best interests. *Kashyap v. Kashyap*, 26 Neb. App. 511, 921 N.W.2d 835 (2018). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . .; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Kashyap, supra.*

Angelica argues that joint custody is "inappropriate" in this case because she and Gregory "cannot communicate with one another, and when they try, conflict inevitably results." Brief for appellant at 21. She specifically states that Gregory "denigrates [her] to the children in filthy language," Angelica and Gregory "do not speak [] face to face but have resorted to communicating by text through Talking Parents," and they "disagree on multiple issues, especially therapy." *Id.*

Angelica further argues that she should have received sole custody of the children because "the various incidents that the children reported to their therapist" show "that [Gregory] is extremely overbearing, controlling, manipulative, and causes them stress after their visits with him." *Id.* at 18. As evidence of this, she states that Gregory "strictly forbids [the children from] discuss[ing] anything that goes on in the house either with their mother or in therapy and monitors their phone calls to make sure that they don't discuss him." *Id.* She also states that Gregory does not allow the children to bring their cell phone to Angelica's house and he "grill[s]" the children "about what happens at [Angelica's] house," causing them stress. *Id.*

Angelica also notes that there was "evidence that [Gregory] has abused [Angelica] physically by shoving her to the ground and not letting her get up." *Id.* at 19. Angelica states that the fact that she was ticketed for the incident is one of the "many examples of abuse she has sustained at [Gregory's] hands." *Id.* She implies that the children lied to law enforcement that she was the first aggressor during the incident.

Angelica also states that "[w]ith respect to [Gregory's] moral fitness, the children have all complained about the way in which their father speaks about their mother calling her a 'bitch,' a 'piece of shit,' and other disgusting terms." *Id.* at 20. Angelica further claims that she has provided the children with "a much better living environment." *Id.*

Gregory "agrees with [Angelica] that it has long been Nebraska law that parties who cannot communicate with one another should not be given joint custody." Brief for appellee at 13. He

states that "it is clear from the case at hand that both parties had asked for sole custody and that the parties had a very difficult time with communication with the other." *Id.* at 18.

Gregory argues that he should have received sole legal and physical custody of the children. He points out that Angelica "failed to exercise her parenting time with the minor children" on various occasions and had a history of failing to communicate with him regarding important decisions impacting the children. *Id.* at 16. He contends that he is "better equipped to provide a stable and loving home in which all of the children's health, safety, and educational needs are adequately met." *Id.* at 18.

Neb. Rev. Stat. § 42-364 (Cum. Supp. 2022) provides:

> Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

The Nebraska Supreme Court has disapproved past cases in which joint custody was disfavored under Nebraska law and instead has held that joint custody is neither favored nor disfavored. See *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692 (2019). The Supreme Court stated:

> We see nothing in the Parenting Act that either favors or disfavors any particular custody or parenting time arrangement. The Parenting Act simply requires that all custody and parenting time arrangements be determined based on the best interests of the child. The Parenting Act "presumes the critical importance of the parent-child relationship in the welfare and development of the child and that *the relationship between the child and each parent should be equally considered unless it is contrary to the best interests of the child*."

*Id*. at 953, 932 N.W.2d at 708 (emphasis in original). The Supreme Court further noted that when parents have not agreed to joint custody, there must be a "hearing in open court and an express finding that joint custody is in the child's best interests." *Id*. at 954, 932 N.W.2d at 708.

Here, the parties had notice that the district court may grant them joint custody since that had been the arrangement under the temporary order since May 2019 and Gregory requested at trial that the court grant him and Angelica joint custody if the court decided against granting him sole custody. And although Gregory and Angelica did not both consent to a joint custody arrangement, the court explicitly found joint custody to be in the children's best interests. The record supports the district court's decision.

Testimony was adduced at trial about both Angelica and Gregory engaging in somewhat troubling behaviors. However, as Wagner testified, it does not appear that there is any reason to "have grievous concerns about [Gregory and Angelica] parenting their children." Wagner also testified that the children loved both of their parents and she ultimately recommended both Gregory and Angelica have parenting time with the children. Both Gregory and Angelica take their children to healthcare appointments, ensure that they go to school, pay for their extracurricular activities, and ensure their needs are met. To the extent Angelica claims that Gregory was abusive

to her and the children, we note that almost all the evidence in the record regarding this issue is conflicting. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

Further, as the Supreme Court noted in *State on behalf of Kaaden S. v. Jeffery T., supra*, which involved animosity and difficulty communicating between the parents, "[t]he trial court's goal was not to find a custody and parenting time schedule the parents thought was fair, but to find one that was actually in [the child's] best interests." *Id*. at 959, 932 N.W.2d at 711. "That required the court to create a parenting plan for a child who has a positive and nurturing relationship with both his parents, but whose parents do not have a good relationship with each other." *Id*. That same assessment can be applied here. In the present case, neither parent was a model parent who consistently placed their children's best interests above their own interests as demonstrated in the evidence and the parties' arguments set forth above.

We conclude that the district court did not abuse its discretion in granting the parties joint custody of the children.

## 2. Final Authority

Angelica contends that the district court erred in awarding Gregory final say in case of an impasse between them in making decisions for the children.

The best interests of the child are the primary consideration for developing custodial plans. *Blank v. Blank*, 303 Neb. 602, 930 N.W.2d 523 (2019). Joint legal custody means mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health. Neb. Rev. Stat. § 43-2922(11) (Cum. Supp. 2022). This means that both parties should work cooperatively together in making such decisions. However, when they cannot do so, the district court gave Gregory the final say. When considering the best interests of a child in developing custodial plans, "it is a common occurrence and a court is permitted to supply a party with final decisionmaking authority in some areas to avoid future impasses which could negatively affect the child while maintaining both parents' rights to consultation and participation in important decisions." *Blank v. Blank*, 303 Neb. at 618, 930 N.W.2d at 536.

The record supports the district court's decision to place final decisionmaking authority in Gregory. Angelica demonstrated a pattern of failing to consult with Gregory regarding important decisions impacting the children, such as selecting numerous healthcare providers without Gregory's input. For example, Angelica testified that she changed the children's doctor and dentist without discussing the changes with Gregory. When asked whether she believes this is "something that [Gregory] should have had a say in based on the fact that [he and Angelica] share[] joint custody," Angelica responded, "No." Angelica also did not notify Gregory when the children missed school until after he inquired about their absences.

On the other hand, while there was testimony regarding a couple of instances where Gregory did not notify Angelica of certain health-related decisions he made for the children, he admitted to his communication shortcomings at trial, acknowledging that there had been some doctors' appointments he could have reached out to Angelica about. Gregory indicated that if the district court were to continue joint custody, he would notify Angelica of important matters

involving the children, including "doctors' appointments," "dental appointments," and "[a]nything that has to do with the school."

Accordingly, we cannot say that the district court abused its discretion in granting Gregory final say upon impasse between the parties in making fundamental decisions related to the children.

### 3. CHILD SUPPORT

On cross-appeal, Gregory contends that the trial court erred in ordering him to pay child support to Angelica. The Nebraska Child Support Guidelines provide that "[w]hen a specific provision for joint physical custody is ordered and each party's parenting time exceeds 142 days per year, it is a rebuttable presumption that support shall be calculated using worksheet 3." Neb. Ct. R. § 4-212 (rev. 2011).

Here, the district court awarded the parties joint legal custody with each party's parenting time totaling more than 142 days per year. Thus, the rebuttable presumption set forth in § 4-212 applies. Gregory argues that although the court awarded "joint physical custody with each party being *ordered* to have equal time with the minor children . . ., the history of the case made it clear that the parties did not actually share equal time and . . . it is likely that [Gregory will] continue to have more time with the children." Brief for appellee at 15. As evidence of this proposition, Gregory noted that he "was granted custody of the children" while Angelica was hospitalized. *Id.* He "continued to have custody of the children for approximately a month at that time." *Id.* He also pointed to various periods when Angelica "failed to exercise her parenting time," including when Gregory was living at the homeless shelter, "a few weeks" following the birth of her child in 2020, when Angelica contracted COVID, and following the passing of Angelica's father. *Id.* at 16.

The record supports the district court's implicit finding that Gregory did not overcome the rebuttable presumption set out in § 4-212. Although Gregory had the children during a significant portion of Angelica's parenting time in 2019, Angelica only failed to exercise her parenting time in 2020 for "a few weeks" following the birth of her child and for "a couple days" following her father's death in 2021. The various times she did not exercise her parenting time were always during extenuating circumstances and not as a matter of routine. We therefore find that the court did not abuse its discretion in ordering Gregory to pay child support to Angelica based upon a joint custody calculation.

### VI. CONCLUSION

For the reasons set forth above, we affirm the district court's April 13, 2022, amended decree.

AFFIRMED.